UNITED STATES of America, Plaintiff,

v.

Clarence Louis TITSWORTH, Defendant.

No. CR. 75–0–106.

United States District Court,
D. Nebraska.

Dec. 1, 1976.

Daniel E. Wherry, U. S. Atty., Omaha, Neb., for plaintiff.

Kenneth P. Weiner, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This matter comes on for determination with reference to defendant's motion for new trial (Filing No. 35), and motion for subpoena and interrogation of jury (Filing No. 37), subsequent to oral argument and the submission of briefs by the parties hereto. Both motions are based upon the assertion that the jury was exposed to prejudicial publicity during their deliberations.[1]

The facts relevant to disposition of this issue may be summarized as follows:

The defendant, Clarence Louis Titsworth, was charged under a two-count indictment with two violations of the Federal Bank Robbery Act, as amended, 18 U.S.C. § 2113.[2]

---

1. While the defendant does allege other grounds in support of his motion for new trial, the Court finds that this claim is the only one which merits discussion.

2. Count II of the indictment alleges a violation of the first paragraph of Section 2113(a), taking money from persons by force and violence and by intimidation. Count I alleges a violation of Section 2113(d), assaulting and putting in jeop-

His trial commenced on August 31, 1976. In its opening statement, the government outlined the evidence it would present against the defendant. The government would rely upon the testimony of two witnesses to prove that the defendant actually participated in the bank robbery. The first witness, John Stanley Davis, was an admitted participant in the robbery who had previously entered a plea of guilty to the offenses charged. The government stated that the second witness, Brenda Nelson, would testify that she was at John Davis' apartment shortly after the robbery and that she saw the stolen money in the possession of defendant and the other participants.

Upon being called to testify by the government, John Davis fully admitted his involvement in the robbery and identified the defendant and one Donald Henry Davis [3] as the other two participants. Brenda Nelson, however, failed to obey a subpoena to be present at trial, and hence her testimony was unavailable. In light of the opening remarks made by the government concerning her proposed testimony, the Court permitted the government, over defendant's objection, to introduce certain testimony to explain her absence to the jury.[4] The scope of the testimony was limited to the fact that Brenda Nelson had been duly served with the Court's subpoena ordering her to appear in court, and that upon her failure to do so, the authorities had been unable to locate her. The jury was instructed that the sole purpose of this testimony was to explain the government's inability to produce a proposed witness.[5]

The defendant did not testify, nor did he offer any evidence. His defense was that the jury should not believe the testimony of John Davis, an admitted accomplice and three-time convicted felon. Counsel for the defendant also attempted to establish on cross-examination and argued in his closing statement that John Davis was attempting to protect his brother by implicating the defendant.

The jury retired to commence their deliberations on September 2, 1976, at 3:40 p.m. Having failed to arrive at a verdict by 10:05 p.m., the jury was permitted to separate for the evening with directions to return to resume their deliberations the next morning at 8:45 a.m. The jurors reconvened at said time, and a verdict of guilty on both counts was returned at approximately 9:10 a.m. Thereupon defense counsel informed

---

ardy the life of a person while committing such offense.

3. Donald Henry Davis was previously tried and convicted of the offenses in question. *United States v. Davis*, CR. 75–0–105 (D.Neb., Feb. 27, 1976). But he was not called to testify at the trial of the defendant.

4. At the time of its opening statement, the government had no reason to believe that Brenda Nelson would not testify at trial. She was in fact present at that time but failed to appear on subsequent trial days. Moreover, she had testified at the trial of Donald Henry Davis.

5. The following instruction was read to the jury:

INSTRUCTION NO. 27

You are admonished and instructed that you must not draw any inferences whatsoever in this case from the fact that a proposed government witness has not testified at trial. The non-appearance of any witness is not evidence of any kind in this case and you must not so consider it.

The government has introduced certain testimony and evidence relating to its inability to produce a proposed government witness. The sole and only purpose of this testimony and evidence was to demonstrate to you the efforts the government has made to obtain the presence of the proposed witness. This evidence has nothing to do with the guilt or innocence of the defendant nor may you draw any inference whatever or speculate as to what the witness would have stated, if anything at all, had she testified, nor may you draw any inference as to whether the testimony of this witness could have been favorable or unfavorable to either party in this case.

As stated before, the burden is always upon the government to prove the guilt of the defendant beyond a reasonable doubt as to each offense charged and your verdict must be based solely and only upon the evidence before you, together with these instructions.

Accordingly, you must completely disregard any statements made by counsel in opening statement or otherwise as to what any proposed witness might testify to if that witness is called to testify at trial.

the Court of a news story which had been broadcast on a local television station the previous evening. The story recited that Brenda Nelson, a material witness in the case of *United States v. Titsworth,* had "appeared apprehensive" shortly before trial and had since disappeared. The news story further recited that no foul play was suspected with reference to the disappearance. After conferring with counsel, the Court examined each juror individually in chambers with respect to his exposure to the publicity. *See United States v. Word,* 519 F.2d 612 (8th Cir.) *cert. denied,* 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1975); *United States v. Concepcion Cueto,* 515 F.2d 160 (1st Cir. 1975); *United States ex rel. Doggett v. Yeager,* 472 F.2d 229 (3rd Cir. 1973); *United States v. McKinney,* 429 F.2d 1019 (5th Cir.), *cert. denied,* 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1970); *Rizzo v. United States,* 304 F.2d 810 (8th Cir.), *cert. denied,* 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962); *Coppedge v. United States,* 106 U.S.App.D.C. 275, 272 F.2d 504 (1959), *cert. denied,* 368 U.S. 855, 82 S.Ct. 92, 7 L.Ed.2d 52 (1961); *United States ex rel. Stouffer v. Commonwealth of Pennsylvania,* 374 F.Supp. 702 (M.D.Pa.1974). *See also* American Bar Association Project on Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press, § 3.5 (1968). Both parties were also given an opportunity to examine the jurors.

Four members of the jury denied having knowledge of any newscast relating to the case prior to the announcement of the verdict in open court. Three jurors admitted having heard one or more fellow jurors mention that the trial was the subject of a newscast, but denied having knowledge of any further details. Three jurors admitted having heard a newscast or being told about one by family members and also admitted having heard discussion of the newscast in the jury room. In response to further inquiry by the Court, each of these jurors explained that the newscast and discussions thereof related only to the fact

that Brenda Nelson was missing and that the F.B.I. was looking for her; no mention was made about the portion of the newscast which described her as apprehensive shortly before trial. One juror admitted having heard a radio broadcast report that "possible foul play" was involved with her disappearance and that John Davis was a cousin to Donald Davis. Said juror further admitted telling this information to two or three other jurors. The last juror to be interviewed was the foreman of the jury. He denied having heard any newscast concerning the trial but stated that someone in the jury room did mention something about a cousin relationship.[6] Finally, each juror was asked whether any newscast or discussion relating thereto had influenced his verdict in any manner and all responded in the negative.

Under these circumstances and for the reasons set out below, the Court finds that a new trial should be granted to the defendant.

■ Every person charged with a crime has an absolute and fundamental right to a fair and impartial trial, and it is the duty of the courts, and also the government, to insure that this right is safeguarded and preserved at all times. It is only upon the evidence produced at trial that the guilt or innocence of an accused should be determined, and he has the right to demand that no other evidence shall be heard or considered by the jury. "[T]he jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." *Mattox v. United States,* 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892).

"In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimum standards of due process. *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682; *Tumey v. Ohio,* 237 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749. 'A fair trial in a fair tribu-

---

**6.** It should be noted that there was some disparity between the accounts given by the jurors as to what actually was discussed in the jury room.

nal is a basic requirement of due process.' *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworne.' Co.Litt. 155b. His verdict must be based upon the evidence developed at the trial. *Cf. Thompson v. City of Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies." . . . [*Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)].

The requirement that a jury's verdict "must be based upon the evidence developed at the trial" goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury. (Footnote omitted.) "The jury is an essential instrumentality—an appendage—of the court, the body ordained to pass upon guilt or innocence. Exercise of calm and informed judgment by its members is essential to proper enforcement of law." *Sinclair v. United States,* 279 U.S. 749, 765, 49 S.Ct. 471, 476, 73 L.Ed. 938. Mr. Justice Holmes stated no more than a truism when he observed that "Any judge who has sat with juries knows that, in spite of forms they are extremely likely to be impregnated by the environing atmosphere." *Frank v. Mangum,* 237 U.S. 309, at 349, 35 S.Ct. 582, at 595, 59 L.Ed. 969 (dissenting opinion)."
*Turner v. Louisiana,* 379 U.S. 466, 471–72, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965).

An important corollary of the requirement that a verdict "must be based upon the evidence developed at trial" is the defendant's right of confrontation, of cross-examination, and of counsel. "[T]he rights of confrontation and cross-examination are among the fundamental requirements of a constitutionally fair trial." *Parker v. Gladden,* 385 U.S. 363, 365, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966). *See also Turner v. Louisiana, supra,* 379 U.S. at 473, 85 S.Ct. 546.

The verdict in a case should be reached "only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907).

Newspaper and television publicity surrounding a trial represent the most common threats to the integrity of the proceedings. This is not to suggest, however, that jury exposure to any publicity vitiates the fairness of the trial. The severity of the threat depends upon both the nature of the information so publicized and the degree of juror exposure to it. Moreover, the judge's response is to be commensurate with the severity of the threat posed.
*United States v. Thomas,* 463 F.2d 1061, 1063 (7th Cir. 1972).

▇ In the instant case, there is no dispute as to the fact that several jurors were exposed to information which was not subjected to confrontation, cross-examination or other safeguards guaranteed to the defendant. The extrinsic news items were not confined to some uncontroverted or merely formal aspect of the case. To the contrary, each item was of a crucial nature. It is true that evidence concerning the government's inability to locate Brenda Nelson had been admitted at trial. But the fact that her disappearance had become a subject of importance of a newscast may have placed undue emphasis on the materiality of such evidence in the minds of the jurors. The jurors could hardly fail to be impressed by a newscast about a missing witness in the case presently before them. Moreover, the news of "possible foul play" had been introduced by a juror into the jury room. Such information strongly suggested to the jurors that her disappearance had been the result of improper conduct on the part of the defendant, something this Court took great precautions to avoid. *See Briggs v. United States,* 221 F.2d 636, 639 (6th Cir. 1955). *Cf. United States v. Noah,* 475 F.2d 688, 692 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 119, 38 L.Ed.2d 54 (1973). Finally, the same juror also heard on a

newscast and revealed to other jurors that John Davis was a cousin to Donald Davis. This latter information was particularly harmful to the defendant. John Davis was the government's only witness with respect to the defendant's participation in the crimes charged. The credibility which the jury attached to his testimony must inevitably have determined the guilt or innocence of the defendant. To be sure, the credibility of this key government witness was assailed by defendant's counsel in open court. On cross-examination and during closing argument, defense counsel argued that John Davis was attempting to protect his brother by implicating the defendant. This line of defense, however, was directly hampered by the newscast. At trial John Davis testified that the third participant in the robbery was Donald Davis. It was the newscast, however, which brought to light a cousin relationship between these two individuals. The possible effect of this extrinsic information is summarized by the defendant as follows:

> It destroys the residual of reasonable doubt that this three times convicted felon, inspired by hopes of leniency, may have lied when he was compelled to name an accomplice in order to protect a relative. Protection of a relative was the crux of defendant's case. If (John) Davis will testify against his cousin, he certainly doesn't seem like a man trying to protect his family. Had that fact been placed in evidence, the prosecution was well aware, the defense could then have presented the evidence pointing to a hostile relationship between the two cousins; but, under the circumstances, the defendant had no right to confront witnesses, etc., as guaranteed by the Sixth Amendment.

Defendant's brief at 7.

Although protection of a relative may not have been the "crux of defendant's case," it was certainly an important part thereof, and where the jurors have knowledge of extrinsic information reflecting upon the defendant's defense, the likelihood of prejudice is particularly great. *Cf. United*

*States v. Kum Seng Seo,* 300 F.2d 623, 625 (3rd Cir. 1962).

Each of these news items, discussed above, possessed the capacity to prejudice the jurors. The Court need not decide whether any one item, by itself, would require a new trial, but the collective impact went beyond tolerable limits under the circumstances of the instant case. *See United States v. Concepcion Cueto, supra,* 515 F.2d at 164. The jurors were exposed to the news items at a crucial moment, immediately prior to the commencement of their second day of deliberations, and shortly before their final vote on the verdict. "A more critical moment would have been difficult to find." *United States v. Kum Seng Seo, supra,* 300 F.2d at 625. *Compare United States v. Concepcion Cueto, supra,* 515 F.2d at 164, with *United States v. D'Andrea,* 495 F.2d 1170, 1173 (3d Cir. 1974). At this most important stage of the proceedings, there was no opportunity for confrontation, cross-examination, or rebuttal by the defendant, nor any opportunity for palliation by the court.

> The point at which the jury begins to deliberate is a "critical juncture" in the trial proceeding principally because there are fewer opportunities to counteract prejudice at this stage than at any other. An article that may be only marginally prejudicial in any other setting is likely to have a disproportionate impact here.

> *United States v. Thomas, supra,* 463 F.2d at 1065.

*See also United States v. McKinney, supra,* 429 F.2d at 1025. Moreover, the jurors had deliberated for over five hours prior to their exposure to the newscast in question, and pursuant to the Court's examination, they admitted a difference among them as to the guilt of the defendant upon their separation for the evening. *Cf. Parker v. Gladden, supra,* 385 U.S. at 365, 87 S.Ct. 468. On the next morning, subsequent to the newscast, the jurors reached a verdict within twenty minutes.

█ The government argues that no prejudice has been shown because each juror stated that his vote was not influenced

by the newscast. Such assurances are not controlling. *See Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). *See also United States ex rel. Dogget v. Yeager, supra; United States v. Concepcion Cueto, supra;* ABA Standards Relating to Fair Trial and Free Press, *supra,* §§ 3.5(f) and 3.4(b). "[E]ach case must turn on its special facts." *Marshall v. United States, supra,* 360 U.S. at 312, 79 S.Ct. at 1173. *See also Gordon v. United States,* 438 F.2d 858, 873 (5th Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971); *Hall v. United States,* 396 F.2d 428 (10th Cir.), *cert. denied,* 393 U.S. 986, 89 S.Ct. 462, 21 L.Ed.2d 447 (1968); *Smith v. United States,* 385 F.2d 34 (5th Cir. 1967); *Adjmi v. United States,* 346 F.2d 654 (5th Cir.), *cert. denied,* 382 U.S. 823, 86 S.Ct. 54, 15 L.Ed.2d 69 (1965); Annot., 31 A.L.R.2d 417 (1953). "Here the content and timing of the material went beyond anything * * * the average juror could withstand. It also went beyond anything the defendant should be forced to accept." *United States v. Concepcion Cueto, supra,* 515 F.2d at 164. As noted by the Court in *Turner v. Louisiana, supra,* "it would be blinking reality not to recognize the extreme prejudice inherent" in the newscast. 379 U.S. at 473, 85 S.Ct. at 550. *See also Estes v. Texas,* 381 U.S. 532, 542–44, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *United States ex rel. Stouffer v. Commonwealth of Pennsylvania, supra,* 374 F.Supp. at 706.

A separate order will be entered this day in accordance with this memorandum opinion granting the defendant a new trial.