**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John C. HERRING, a/k/a Scooter,
Defendant-Appellant.**

No. 76–3086.

United States Court of Appeals,
Fifth Circuit.

March 1, 1978.

Thomas Santa Lucia, Buffalo, N. Y., Albert J. Krieger, Joseph Beeler, Miami, Fla., for defendant-appellant.

D. L. Rampey, U. S. Atty., John D. Carey, Asst. U. S. Atty., Macon, Ga., for plaintiff-appellee.

Before WISDOM, SIMPSON and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

This case comes to us on direct appeal from the appellant's criminal conviction in the United States District Court in Macon, Georgia. The principal issue raised by the appellant concerns the district court's course of action after the leading local newspaper had exposed the existence of death threats against a key prosecution witness. This exposure, on the last day of trial, created the potential of severely prejudicing the jury deliberations in this case. Because we are of the opinion that the trial court's response to this publicity was insufficient to protect the appellant's right to an impartial jury verdict and because we are unable to determine that an unbiased verdict was in fact reached, we must reverse this conviction and remand the case for further proceedings.[1]

## I

From the inception of this prosecution, it was clear that this case was bound to receive a great deal of publicity. The appellant, John C. "Scooter" Herring, was at one time a road manager for Gregg Allman, a prominent musician of the rock persuasion who seems to have a penchant for attracting substantial national publicity.[2] When it became known that a federal grand jury in Macon was investigating possible drug charges involving Allman, the grand jury's investigation quite understandably attracted the attention of the news media. Media coverage intensified after Herring was indicted[3] and Allman agreed to testify at Herring's trial in exchange for a grant of immunity. By the time the trial began, the public eye, particularly in the Macon area, was sharply focused on the case.[4]

The jury selection for this trial began on June 21, 1976, in a relatively normal fashion. A venire was assembled and the voir dire examination began. Although the ex-

1. Because of our disposition of this appeal on this issue, it is unnecessary for us to consider the appellant's other claims of error.

2. Allman is married to television personality Cher Bono Allman, a figure of some prominence in her own right. This fact may have tended to enhance the volume of public scrutiny accorded Allman during the pendency of this case.

3. This indictment was the one upon which Herring was eventually tried and convicted, and it charged him with five violations of the Com-

prehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801 et seq. (1970). Count I alleged that he had conspired with an individual named Joe Fuchs to commit several drug offenses in violation of 21 U.S.C. § 846 (1970). Counts II through V alleged various substantive violations of the Act.

4. Although there was no defense motion for a change of venue, this is quite understandable in view of the national, as well as local, publicity which the case had generated.

amination of the veniremen revealed that most had heard of at least some aspects of the case through the news media, the district court eventually empanelled a jury which had unanimously expressed confidence in their ability to decide the case impartially on the facts presented at trial. After the jury had been sworn, the trial court gave them the brief admonition that "you should not have any contact with anybody about this case"[5] and then excused them for the day. The jury in this trial was not sequestered, and the record reflects no defense motion seeking that course of action.

The actual presentation of evidence began on June 23. Immediately prior to the opening statements of counsel, the district court gave a brief set of cautionary instructions, which included a directive not to "pay any attention to anything other than what you hear in the courtroom. There may be things in the newspaper, there may be reports on television, you might hear somebody on the street talking. Just pay no attention to anything outside the courtroom."[6] Aside from this language, no further admonitions were given at any time during the trial touching upon the jurors' potential exposure to publicity in the case.[7]

After the conclusion of counsel's opening statements, the government presented its case-in-chief, which consumed only two days of the trial. The lengthiest testimony came from the first witness, Joe Fuchs. Fuchs was an ex-pharmacist and an alleged co-conspirator in connection with much of Herring's drug activity.[8] Aside from Fuchs, Gregg Allman testified most lengthily.

Allman took the stand on the afternoon of the first day of trial, June 23.[9] He testified for the remainder of that day and for a portion of the next. On direct examination, Allman told of meeting Herring in a Macon bar in 1973 and the subsequent development of a mutual friendship. Allman testified that in late 1973 or early 1974, Herring sold him some pharmaceutical cocaine and some Demerol. This was the first drug transaction between Allman and Herring, and it instituted a pattern of activity which continued throughout 1974. Allman stated that he later came to know the pharmacist, Fuchs, as Herring's supplier and that on occasion Allman would deal directly with Fuchs. Usually Allman would place a drug order with either Fuchs or Herring and would pay Herring upon delivery. This arrangement existed until the latter part of 1974, when Herring told Allman that government drug inspectors were "really on" Fuchs.

Obviously, Allman's testimony was extremely damaging to the defense. Understandably enough, defense counsel's cross-examination of Allman was both lengthy and detailed, and the attack on Allman's

---

**5.** 1st Supp. Record, vol. 3, at 25.

**6.** Record, vol. 2, at 4. It will become evident later in this opinion that the district court's initial cautionary instruction regarding publicity was inadequate in two respects. First, it was delivered as part of a general set of opening instructions, and no particular emphasis or detail seems to have been placed on the already apparent publicity problem. Second, it is certainly arguable that the text of this instruction did not explicitly direct the jury to shun any publicity about the case; the jury members were told merely to "pay no attention" to any publicity. It seems to us that a juror could assimilate any publicity in the case with a firm resolve not to be affected by it, and then in good conscience believe that he had followed the court's instructions to the letter. *See* ABA Standards Relating to Fair Trial and Free Press § 3.5(e) (1968).

**7.** To the extent that the court's instruction quoted in footnote 11 *infra* may indicate that further instructions on the issue were given during the trial, the quoted instruction is inaccurate.

**8.** Some four months prior to Herring's trial, Fuchs pled guilty to a conspiracy charge in the case pursuant to a plea agreement with the government and was sentenced to ten years in prison on that charge. At the time of Herring's trial, Fuchs was serving his sentence in the federal penitentiary in Atlanta. He appeared at trial under a writ of habeas corpus *ad prosequendum.*

**9.** At the outset of Allman's testimony, the district court disclosed to the jury that Allman was testifying under a court order granting him immunity in exchange for his testimony.

credibility was forceful. The defense employed several devices to impeach Allman's testimony, including certain statements made during Allman's grand jury appearance and his admitted use of drugs during the period covered by his direct testimony. Additionally, the defense focused heavily on the direct connection between Allman and Fuchs, and on Allman's admissions that the defendant Herring had actually attempted in 1974 to persuade him to stop using drugs.

A brief redirect examination followed this cross-examination, and Allman then stepped down from the stand sometime during the morning of June 24, the second day of the trial. The government called several additional witnesses and rested its case-in-chief at the end of the day. Up to this point, the trial had proceeded relatively smoothly.

On June 25, however, an unfortunate series of events occurred. On the morning of that day, Macon's leading daily newspaper, the *Macon Telegraph*, carried a front-page story on Allman under a banner headline that read "ALLMAN UNDER HEAVY GUARD" and bore a subtitle reading "Death Threats Reported." Macon Telegraph, June 25, 1976, at 1A. In the middle of the front page, above the crease, was a photograph of Allman being escorted by several official-looking gentlemen; this photograph was captioned "Gregg Allman with Federal Bodyguards in Bibb Courthouse." *Id.* The lead story under the headline began as follows: "Threats against the life of Macon rock superstar Gregg Allman have prompted federal officials to shield the key witness from danger by ordering four U.S. Marshals to give him 'protective custody' around the clock." *Id.* The story went on to report that federal officials had confirmed that Allman had received threats on his life and that "stiff security measures" were in force at the Macon federal courthouse, where Herring's trial was in progress. *Id.* At one point the newspaper quoted the district judge presiding over Herring's trial as stating that the security measures had been ordered "out of an overabundance of precaution." *Id.*

The *Telegraph*'s headline, photograph and article were the first topics of discussion when the trial resumed that morning. In open court, but before the jury had been summoned to the courtroom, defense counsel brought to the attention of the court a copy of the newspaper in question and made the following comments:

I offer that June 25th newspaper in evidence, Your Honor, and ask the Court to ask the jurors if they read that paper, No. 1; if any juror indicates that he has read the article, to inquire further as to whether it influenced him in any degree in his decision of this case, in effect to see if he has prejudged the case as a result of that newspaper article, and if he has, I would ask the Court to inquire even further as to how it influenced him or her and how it may have prejudged him or her, and pursuant to those requests I would reserve then a request further to move for a mistrial in the event any one juror has been unduly influenced prejudicially to my client.

Record, vol. 3, at 356–57. The government did not respond directly to defense counsel's request that the court examine the jury regarding the newspaper article, stating only that it felt that the court's standard pretrial instructions had sufficiently covered the matter and that "that is not sufficient trial publicity to cause a mistrial in this case." *Id.* at 357. Over defense counsel's objection, the trial court declined to question the jury in order to determine the extent of their exposure to the newspaper article or headline. The district court ordered that a copy of the June 25 *Telegraph* be placed in the record for appeal purposes, and Herring's trial resumed.

The only defense witness was Herring himself, and he took the stand almost immediately after the events just described. Although Herring's testimony was brief, he did deny furnishing Allman with drugs while Allman was on tour. Herring also denied giving Allman drugs in November of 1973, a date which had surfaced during Allman's testimony. After a brief cross-examination by the government, the defense

rested. Following closing arguments and instructions from the court, the jury retired to deliberate. About three hours later the jury returned a guilty verdict against Herring as to each of the five counts in the indictment.

## II

We should begin our discussion of the law in this case by emphasizing several crucial points. First, the newspaper article in question here appeared at a critically important juncture in the trial of this case: immediately prior to the defendant's testifying in his own defense. Second, although the content of the article, and the accompanying headlines and photograph, was straightforwardly factual, it would be folly to overlook the gargantuan possibilities for juror prejudice that could flow from this publicity. At the time the article appeared, the jury had just heard Gregg Allman testify in a manner that was extremely damaging to the defense. Thus, reports of threats on Allman's life would be likely to lead any reasonable mind at least to consider the inference that the threats were in some fashion attributable to the defendant or someone acting in concert with him. Third, the headlines, photograph, and article appeared on the front page of Macon's leading morning newspaper. Since the jury in this case was not sequestered, it would defy common sense to suppose that not a single member of the jury had at least glanced at the headline and photograph;[10] as we have previously recounted, these items appeared in the most conspicuous area of the *Telegraph*'s front page. Fourth, defense counsel squarely moved for remedial measures in the form of a court-conducted voir dire examination of the jury in order to determine the extent of juror contact with this particular issue of the newspaper. The defense also indicated to the court that it might move for a mistrial of the case based on the results of the requested voir dire examination.

We should also emphasize what is not presented under the facts of this case. This is not a case involving publicity so pervasive and expressly prejudicial that it occasions a violation of the fifth (or fourteenth) amendment's due process clause. *See, e. g., Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). In such cases, the record of the trial proceedings, and the publicity attendant thereto, will lead an appellate court to the presumption that the question of a defendant's guilt was prejudiced by the publicity preceding or contemporaneous with that defendant's trial. *Murphy v. Florida*, 421 U.S. 794, 798, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (*citing Sheppard; Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); and *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)). The record of this case presents us with only one instance of publicity affecting this defendant's rights, and indeed this one item appears to have been quite objective. Thus, this case is not like *Sheppard*, where it was patently obvious that the news media and not the jury finally passed judgment on the defendant's guilt.

■■■ This case does not call for full-blown due process clause analysis; however, this does not foreclose our use of those decisions in reviewing the district court's action after the publicity was brought to its attention. In our judgment, we have before us yet another situation in which a presumption of prejudice is appropriate for appellate purposes. The inferences which would naturally flow from the appearance of the newspaper issue in question, coupled with a sound regard for the sanctity of the jury system, lead us to presume that some prejudice of impermissible dimension did in fact exist in the jury room when the verdict in this case was decided. We think this presumption is required in light of the district court's refusal to inquire into the matter when the defense requested that course of action; as a result of that refusal, there

---

**10.** And this is particularly so in light of the cautionary instructions delivered to the jury at the beginning of the trial. See note 6 *supra* and accompanying text.

is nothing on the record before us to indicate that the defendant's guilt was *not* impermissibly prejudged. The district court felt that its preliminary instructions to the jury, cautioning them to disregard any mention of the case outside the courtroom, were sufficient to ensure a fair trial.[11] We must disagree. In cases of this sort, we fully approve the practice recommended by the American Bar Association.

If it is determined that material disseminated during the trial goes beyond the record on which the case is to be submitted to the jury and raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material. The examination shall take place in the presence of counsel, and an accurate record of the examination shall be kept.

ABA Standards Relating to Fair Trial and Free Press § 3.5(f) (1968).

Thus, the ABA recommends a procedure which encompasses a threshold inquiry in two steps. Once material that has been disseminated during a trial is brought to the trial court's attention, the first step of the court's inquiry should focus on the nature of the material which has been disseminated. The critical question here is whether that material "goes beyond the record . . . and raises serious questions of possible prejudice" to the litigants. Of necessity, this question is a complex one. The court should consider how closely related to the case the material is.[12] In this connection, the court should also examine the nature of any defenses raised in order to weigh the effects of the publicity on those defenses. Another important consideration is the timing of the publicity. Did it arise at a critical moment in the trial, as in Herring's case where the publication of the news report in question occurred on the morning of the day when the defendant took the stand?[13] And, of course, occasionally there are cases where material is disseminated which not only recounts facts outside the record but also speculates directly on a defendant's guilt or innocence.[14]

11. During its charge to the jury at the close of all the evidence, the district court also gave a brief instruction touching upon the publicity issue. This charge read as follows:

Now it is upon the evidence and that alone, when taken in connection with the law as it is now being given you, that you are to find a verdict. Now when I say the evidence and that alone, that of course means the evidence that you have heard in this courtroom. You will recall at the beginning that you were advised and on several occasions cautioned that you were to consider only the evidence heard in the courtroom, that you were not to pay any attention to anything outside of the courtroom, not to have any contacts with anybody who may have anything to do with the case, that you were not to discuss the case among yourselves or with anybody else. I simply emphasize again that you are to consider only the evidence that you have heard in this courtroom.

Record, vol. 3, at 413–14. For the purposes of the instant case, we have assumed that the trial court fully contemplated giving this instruction during its jury charge, and we have considered whatever effect this instruction might have had toward dissipating the prejudice stemming from the publicity in question.

12. As an example, we reiterate that the publicity in Herring's case involved a witness who had actually appeared before the jury a day earlier.

Clearly, the publicity was very closely related to the trial of the case below. The significance of the relationship between the publicity in question and an important feature of a given case is stressed in *Hanscomb v. Meachum*, 435 F.Supp. 1162 (D.Mass.1977). In that case, a habeas petitioner alleged that his state rape trial was tainted because, during a weekend jury recess, a major local newspaper reported that the Chief Justice of the Massachusetts Superior Court had severely chastised a jury in an unrelated rape case for returning a not guilty verdict. The Chief Justice denounced the "attitudes of jurors toward rape victims" and exhorted jurors to be very strict with rape defendants generally. *Id.* at 1164. The habeas petition was denied because the district court concluded that the jury voir dire and subsequent corrective measures had cured any prejudicial effects of the article.

13. Which was also, as things turned out, the same day that the case was submitted to the jury.

14. Probably the most notorious example of this can be found in the circumstances surrounding the state court trial in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

If, upon completing the first step of its inquiry, the trial judge concludes that material has been disseminated that does in fact "raise serious questions of possible prejudice," a second inquiry should follow to determine the likelihood that the damaging material has in fact reached the jury. Initially, of course, the court should consider whatever precautions it has already taken to insulate the jury. For example, if the jury has been sequestered, one would normally expect that no extra-record material has reached the jury room. By the same token, if the material was published in a relatively obscure manner—say, in an out-of-town newspaper—one would expect that the material had not reached even an unsequestered jury. Another relevant point lies in the nature of the trial judge's previous instructions on the matter. Has the court told the jury not merely to disregard but *not to examine at all* any external information on the case, especially that which appears in the news media? Has the court so instructed the jury on a regular basis, and how much time has elapsed since the court's last directive and the dissemination of the material in question?

Once this two-step threshold inquiry is concluded, the district court should have a sound basis for deciding whether the appearance of the material before it calls for a voir dire examination of the jury members. If, in the court's view, the material does in fact raise serious questions of possi-ble prejudice, the ABA recommends that the court *shall* question the jurors "on motion of either party." This questioning should be as neutral as possible and should be confined at first to the issue whether any jurors have actually been exposed to the damaging material. If any have, they should be further questioned to determine the extent of that exposure and its effects on their ability to render an impartial verdict.[15] Such an examination of the jurors would provide guidance in the record—for both the trial and the appellate courts' purposes—on how to proceed from that point.

As we have already discussed, it is our conclusion that the publicity which arose at Herring's trial fully warranted a court-conducted voir dire of the jury members. Defense counsel squarely moved for such questioning in the proceedings below, and the district court declined. In our view, it was error for the district court to shun this motion, and this error requires that we reverse the conviction in this case as an exercise of our supervisory powers.[16]

Although cases involving questions of prejudicial publicity necessarily tend to turn on their own facts, this case bears a striking similarity to *United States v. Titsworth*, 422 F.Supp. 587 (D.Neb.1976), in which the District Court of Nebraska followed a course of action that we consider proper. In that case, the jury had already begun its deliberations and recessed for the evening when a potentially damaging news

---

**15.** Jurors' assurances of impartiality in this context are not always dispositive, of course. *See, e. g., Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

**16.** As previously recounted, this case comes to us on direct appeal, and our reversal of this conviction is predicated solely upon our supervisory power over the district courts. *See, e. g., Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). At this point, we need not conclude that this defendant was deprived of any rights of constitutional dimension.

In several cases more or less analogous to the one before us, various circuits have approved procedures substantially similar to that suggested by the ABA Standards. *See, e. g., United States v. Perrotta*, 553 F.2d 247 (1st Cir. 1977); *United States v. Concepcion Cueto*, 515 F.2d 160 (1st Cir. 1975); *United States v. Word*, 519 F.2d 612 (8th Cir.), *cert. denied*, 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1975); *United States ex rel. Doggett v. Yeager*, 472 F.2d 229 (3d Cir. 1973). *See also Hanscomb v. Meachum*, 435 F.Supp. 1162 (D.Mass.1977). *Cf. United States v. Alessio*, 528 F.2d 1079, 1083 (9th Cir.), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976); *Margoles v. United States*, 407 F.2d 727, 735 (7th Cir.), *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). And in a situation procedurally distinguishable from the instant one, a panel of this court has remanded a case with directions that the district court conduct the sort of inquiry which we now recommend. *United States v. McKinney*, 429 F.2d 1019 (5th Cir.), *cert. denied*, 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1970).

report was disseminated by the local media. The news report in question had appeared in a local television news broadcast and had indicated that a material government witness had "appeared apprehensive" shortly before the defendant's trial and had "disappeared" during that trial. Significantly enough, the news report also had disclosed that no foul play was suspected in connection with the witness's disappearance.[17] Nevertheless, the district court, after conferring with counsel, conducted a voir dire examination of the jury in order to determine the extent of their contact with the news item and the extent of any prejudice resulting therefrom. Based upon the results of that inquiry, the court eventually granted a defense motion for a new trial.[18]

In this case, the district court committed reversible error when it declined to follow the course of action undertaken by the district court in *Titsworth*. The district court in Herring's case should have examined each juror separately, in the presence of counsel, to determine (1) how much contact the jury members had had with the damaging publicity and (2) how much prejudice to the defendant had resulted from that contact, assuming that any had occurred. For the present, we are unwilling to speculate on the extent of whatever prejudice existed; the point, however, is that since the district court did not question the jury members in order to ascertain the extent of that prejudice, we would have to speculate to conclude that undue prejudice did not exist. In the interests of justice, we must give the defendant the benefit of the doubt in this connection. The state of the record now before us permits no other action.

For the foregoing reasons, the judgment of the district court is REVERSED and this case is REMANDED for further proceedings.

17. This is a point of distinction between *Titsworth* and Herring's case. The newspaper coverage involved here contained no information regarding the source of any threats on Gregg Allman's life; there was nothing in the publicity, as there was in *Titsworth*, to negate any inferences that a jury might draw adversely to the defendant. All that this means is that the publicity involved in *Titsworth* was potentially less prejudicial than the publicity here in question. Thus, our approval of the district court's actions in *Titsworth* a fortiori calls for the reversal of Herring's case.

18. The district court's memorandum opinion does not disclose whether the defense in *Titsworth* immediately moved for a mistrial based upon the results of the court's voir dire examination of the jury. If such a motion was made and denied, the court's granting of the subsequent new trial motion of course remedied the error of that ruling.