IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

92-5593

_____

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

          versus

OSCAR MARTINEZ-MONCIVAIS,

                              Defendant-Appellant.

_____

Appeal from the United States District Court
      for the Western District of Texas
_____

(February 11, 1994)

Before GARWOOD and BARKSDALE, Circuit Judges, and SHAW* Chief
Judge.

SHAW, Chief Judge:


                    O P I N I O N

     In May 1990, a grand jury sitting in the San Antonio Division
of the Western District of Texas returned a 24-count indictment
charging 36 individuals with participating in a far-reaching
criminal enterprise involving the importation, transportation, and
distribution of substantial amounts of illegal drugs.  The
appellant, Oscar Martinez-Moncivais ("Martinez"), was specifically

_____

     *Chief Judge of the Western District of Louisiana, sitting
by designation.

charged in Count Three of the indictment with conspiracy to possess with intent to distribute marijuana and cocaine, and in Count Four with conspiracy to import with intent to distribtue marijuana and cocaine, all in violation of 21 U.S.C §§ 846 and 841(a)(1). The conspiracy began in 1983 and continued until the date of the superseding indictment in May of 1990. After a trial involving Martinez and two other defendants, the jury found Martinez not guilty on Count Four, but guilty on Count Three for conspiracy to possess with intent to distribute in excess of 1,000 kilograms of marijuana, and in excess of 5 kilograms of cocaine. On May 11, 1992, the district court judge sentenced Martinez under the sentencing guidelines to imprisonment for 262 months, supervised release for five years, and fined him $10,000 exclusive of the special assessment.

I.  FACTS

Oscar Martinez was charged with transporting large amounts of marijuana and cocaine for an illegal narcotics enterprise known as the Salinas organization. The organization was headed by Alberto Salinas-Trevino (Salinas) and his brother Ramiro Salinas, and its interests stretched from Mexico into the United States.

The evidence against Martinez at trial came primarily from Government witness, Francisco De Leon Ortiz (De Leon). De Leon worked as the personal driver for another of Alberto Salinas's brothers, Baldemar Salinas, and as a warehouse worker and truck driver for the Salinas organization. De Leon testified that he first met Martinez when Martinez drove a tanker truck full of lime

2

to the Span Tile warehouse where De Leon was working. The Span Tile warehouse, according to the evidence at trial, was one of the centers for the Salinas organization's importation and distribution of illegal narcotics. De Leon testified that customarily, workers at that warehouse would extract the lime from such incoming tanker trucks and then unload thirty-five gallon steel barrels that had been buried in the lime inside hidden compartments. The marijuana and cocaine were contained in these barrels.

According to the evidence, from 1986 to the summer of 1987, Martinez transported drug-filled barrels inside hidden compartments in lime-filled trucks to the warehouse and picked up the barrels in trailers and transported them elsewhere. De Leon and others would unload the barrels from the hidden compartments of the tanker trucks driven by Martinez. Martinez was not directly involved in either the loading or unloading of the barrels into the secret compartments. He was, however, one of only four or five drivers making deliveries to and from the Span Tile warehouse during the period of time that Martinez worked as a truck driver for the Salinas organization. There was additional testimony that Martinez worked directly for Alberto Salinas.

There was further testimony that no one at the warehouse ever did any business concerning tiles. The tanker trucks that arrived contained drug-filled barrels buried in lime, and the trucks that left the warehouse carried drugs. No tiles were manufactured, stored, or sold at the Span Tile warehouse.

Martinez's defense to the charges was that although he did

drive some of the trucks loaded with marijuana and cocaine, he had no knowledge that the trucks were carrying drugs because he was never present when the trucks were being loaded and unloaded, and because he always kept to himself, never talking to anyone at the warehouse about the business. The jury did not believe this defense and found sufficient evidence to convict Martinez on one count of conspiracy to distribute narcotics.

II. DISCUSSION

Martinez appeals the decision of the jury in this case, as well as certain rulings made by the district court judge, and the sentence that the judge imposed. We will address each argument that Martinez raises on appeal.

A. *Sufficiency of the Evidence*

Martinez first contends that the weight of the evidence does not support the jury's verdict finding him guilty of conspiracy. As a reviewing court, we must examine the evidence in the light most favorable to the verdict. United States v. Ayala, 887 F.2d 62, 67 (5th Cir. 1989). We will affirm a verdict "if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." Id., quoting U.S. v. Palella, 846 F.2d 977, 981 (5th Cir.), cert. denied, 488 U.S. 863 (1988). In this particular case, we will affirm the jury's determination if there was sufficient evidence for us to conclude that it was not irrational for the jury to have found that the Government proved the elements of the crime charged beyond a reasonable doubt.

4

To convict a defendant of conspiracy to distribute narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846, the Government must prove three elements of the crime beyond a reasonable doubt: 1) that there was an agreement between two or more persons to violate the narcotics laws; 2) that the accused knew of the agreement or conspiracy; and 3) that he voluntarily joined in the conspiracy. United States v. Singer, 970 F.2d 1414, 1418 (5th Cir. 1992); United States v. Rodriguez-Mireles, 896 F.2d 890, 892 (5th Cir. 1990). The required elements of a narcotics conspiracy need not be proved by direct evidence but may instead be established solely by circumstantial evidence. Ayala, 887 F.2d at 67; United States v. Wright, 797 F.2d 245, 253 (5th Cir. 1986).

Martinez contends that, based on the circumstantial evidence that the Government presented at trial, no rational jury could have reasonably inferred either his knowledge of the existence of drugs in the trucks he was driving or his voluntary participation in the conspiracy. Absent adequate proof establishing those two elements of the crime, Martinez correctly argues, the evidence would not support the jury's verdict finding Martinez guilty of violating Sections 841(a)(1) and 846 of Title 21.

Concerning the second element of the crime, appellant's knowledge of the narcotics conspiracy, Martinez argues that as a truck driver for the Salinas organization he had been merely present at the center of the Salinas drug import/export business. He contends that because the drugs were shipped in barrels that were placed into hidden compartments inside the truck's trailer and

5

then covered with lime, he did not know that he was transporting drugs -- that he thought he was simply hauling lime. He argues that because there was no evidence that he ever witnessed the drugs being loaded or unloaded from his truck at the Span Tile warehouse he was therefore unaware that he was transporting drugs. In other words, Martinez maintains that his mere proximity to criminal activity is insufficient evidence of his knowledge of, or his participation in, the conspiracy. Martinez is only partially correct. In <u>United States v. Maltos</u>, we said:

> mere presence at the crime scene or close association with conspirators, *standing alone*, will not support an inference of participation in the conspiracy. 985 F.2d 743, 746 (5th Cir. 1992)(emphasis added).

In this case, Martinez's presence at the center of the criminal activity does not stand alone as the only evidence of his knowing participation in this conspiracy. There are several other facts that when added to Martinez's presence provide ample evidence to support the jury's verdict finding him guilty of violating 21 U.S.C. §§ 841(a)(1) and 846.

First, Martinez was "merely present" at the center of the conspiracy's criminal activity at the warehouse on more than an isolated or random occasion. He was "merely present" at that warehouse making deliveries as often as once or twice a week for the better part of a year. The cases Martinez cites in support of his "mere presence" argument involve defendants whose presence at the scene of criminal activity occurred on isolated or random occasions. <u>See</u> <u>United States v. Skillern</u>, 947 F.2d 1268, 1274 (5th Cir. 1991); <u>United States v. Blessing</u>, 727 F.2d 353 (5th Cir.

6

1984). The implicit rationale behind the "mere presence" argument is the theory that there may often be innocent parties who on occasion unwittingly associate with guilty parties at the scene of their criminal activity. See United States v. Fitzharris, 633 F.2d 416, 423 (5th Cir. 1980). So we have said that it is irrational for a trier of fact to infer from a person's *mere random presence alone* that the person was a knowing participant in the conspiracy. See United States v. Tolliver, 780 F.2d 1177, 1182 (5th Cir. 1986). In this case, however, Martinez was one of only a handful of drivers that the Salinas organization used to make deliveries to and from the Span Tile warehouse. The evidence showed that these deliveries and pickups were made by the drivers on the average of two to three times per week. This is not the type of "mere presence" with which the courts in Blessing and Skillern were concerned.

Second, Martinez was entrusted with transporting millions of dollars worth of drugs. Other circuits have held that "it is reasonable for a jury to conclude that in the course of transporting millions of dollars of readily marketable marijuana through channels that should lack the protections of organized society, a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders." See United States v. Cruz-Valdez, 773 F.2d 1541, 1547 (11th Cir. 1985), cert. denied sub nom. Ariza-Fuentas, 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986). Put another way, reasonable jurors could conclude that Salinas would not have entrusted millions of dollars in each truckload of drugs

7

to an unknowing, innocent driver. The jury could reasonably conclude that Salinas would have considered the risk to be far too great that such a driver, if he did discover the hidden drugs on one of his many trips, would inform the authorities, or perhaps try to sell the drugs himself, depriving Salinas of the millions of dollars in profits.

Third, the evidence in this case shows that there was never a legitimate business operating at the Span Tile warehouse where Martinez made his frequent pickups and deliveries. The evidence shows that no one working at the Span Tile warehouse conducted any business concerning tiles. Moreover, the warehouse facility was not easily accessed. There was a guarded gate that had to be opened before any of the trucks could enter the facility -- another sign that the jury could infer was inconsistent with the operation of a legitimate business.

Another fact that was inconsistent with Martinez's defense that he was merely an unknowing driver was that the head of the Salinas organization, Alberto Salinas, purchased a new passenger truck for Martinez as a gift. Although Martinez maintained that the truck was not a gift, and that he would have paid Salinas back for it, a jury could reasonably infer that in a normal business relationship, an hourly-wage truck driver would not ordinarily receive such an extravagant gift or bonus from his employer.

Finally, there was also testimony that Martinez had agreed on the spur of the moment to drive a truckload of "lime" from Texas to California immediately. He agreed to do so despite the fact that

8

Salinas's decision and request was made outside a McDonald's restaurant in response to an emergency situation,[1] and even though the trailer Martinez was to haul did not have a license plate. With regard to this particular trip, Mario Salinas's personal notes, which were his records of where his trucks were going and which were introduced at trial, contained the notation "one, Oscar" with the date of the trip to California, "7/25/87," and a reference to "polvo," which means "powder." On this same trip, Martinez was ticketed by the California Highway Patrol for failing to keep a logbook on that trip, as required by law, and as Martinez regularly did on his trips, according to the testimony of his wife.

In summarizing, then, the issue of the sufficiency of the evidence in this case, mere presence at the scene of criminal activity is insufficient evidence to support a conviction for participation in a narcotics conspiracy when such evidence stands alone. When, as here, the defendant's presence is more than isolated or random and is considered along with the other evidence presented, we cannot say that the jury was irrational in finding Martinez guilty of knowing, voluntary participation in the narcotics conspiracy alleged in this indictment. See United States v. Rodriquez-Mireles, 896 F.2d 890, 893 (5th Cir. 1990). The

---

[1]  According to the record, Salinas had received a tip that federal agents may raid the Span Tile warehouse. Two of his people immediately loaded the drugs from the warehouse into a trailer. The next day Salinas and others met at a McDonald's restaurant, while Martinez waited outside. After the meeting they asked Martinez to transport the untagged trailer to California immediately. There was no evidence at trial of any particularly dangerous shortage of lime in California that would have necessitated such an immediate shipment.

combined effect of all of the circumstantial evidence allowed the jury to infer that Martinez had not been consistently duped into unwittingly transporting illegal drugs. The evidence presented was sufficient to show that Martinez had a subjective awareness of the high probability that he was involved in illegal conduct. See United States v. Stouffer, 986 F.2d 916, 925 (5th Cir. 1993). The jury had ample evidence to conclude that Martinez was a knowing and voluntary participant in the Salinas organization's drug distribution business.

## B. *Propriety of the Jury Trial Proceedings*

Martinez also raises several issues on appeal concerning the district court judge's handling of particular aspects of the trial proceeding. Specifically, Martinez claims that jury misconduct occurred during deliberations that necessitated the judge's granting his motion for a new trial; that mid-trial publicity concerning the voluntary absence of a co-defendant prejudiced his defense and required a voir dire of jurors; and that the judge improperly answered a question from the jury by commenting on the evidence.

Martinez's contention that there was jury misconduct in this case is wholly without merit. We review the trial court's decisions on this issue under the abuse of discretion standard. Tanner v. United States, 483 U.S. 107, 117, 107 S.Ct. 2739, 2746, 97 L.Ed.2d 90 (1987); United States v. Khoury, 539 F.2d 441, 443 (5th Cir. 1976), cert. denied, 429 U.S. 1040 (1977).

10

In this case, one of the jurors stated in a post-trial affidavit that two other jurors suggested that if the defendant had been innocent he would have taken the stand in his own defense.[2] Outside of the narrow exception that arises when there is evidence of outside influences on a jury, a court should adhere to the common-law rule against admitting juror testimony to impeach a verdict. See id., citing McDonald v. Pless, 238 U.S. 264, 267 (1915); Hyde v. United States, 225 U.S. 347, 384 (1912). In 1915, the Supreme Court stated the rationale behind this rule:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.... The result would be to make what was intended to be a private deliberation, the constant subject of public investigation -- to the destruction of all frankness and freedom of discussion and conference. McDonald v. Pless, 238 U.S. at 267.

Martinez correctly states that a trial court must hold an evidentiary hearing when a defendant shows that external influences[3] were brought to bear on the jury's deliberative

_____

[2] Other circuits have held testimony or affidavits of jurors to be incompetent to show a jury's misinterpretation of instructions. See Farmers Coop. Elev. Ass'n. v. Strand, 382 F.2d 224, 230 (8th Cir. 1969). In Tanner v. United States, the Supreme Court noted that the Senate specifically rejected a version of Federal Rule of Civil Procedure 606(b) that would have permitted the impeachment of verdicts by inquiry into what happened in terms of conduct in the jury room. 483 U.S. at 123, citing S. Rep. No. 93-1277, p. 13 (1974).

[3] Martinez argues that "external influences" and "extraneous prejudicial information" are different concepts under Federal Rule of Civil Procedure 606(b). He suggests that external influences generally include contacts between lawyers or parties to the case and jurors, threats on jurors, and so forth.

11

process. In this case, however, the jury did not encounter improper external influences that would necessitate an evidentiary hearing. See United States v. Duzac, 622 F.2d 911, 913 (5th Cir.), cert. denied, 449 U.S. 1012 (1980). In the same affidavit, the affiant states that other jurors reminded the jury of the judge's instructions that they could not take into account Martinez's decision not to testify in his defense. The affiant went on to state that two jurors' statements did not weigh heavily in the jury's deliberative process and were not a basis for the jury's decision to find Martinez guilty. Based on these facts, it is clear that the judge did not abuse his discretion in determining that the information contained in the affidavit was not an adequate basis on which to grant Martinez's motion for a new trial based on a claim of jury misconduct.

Similarly, Martinez argues that the district judge erred in

_____

Extraneous prejudicial information, he argues, is a broader concept embracing "more than extrarecord material brought to the jurors' attention by outside sources or through inadvertence." The cases he cites in support involve situations in which the jurors bring outside information into deliberations themselves. See, e.g., In re Beverly Hills Fire Litigation, 695 F.2d 207 (6th Cir. 1982); United States v. Castello, 526 F.Supp. 847 (W.D.Tex. 1981). These cases usually involve tests or experiments that jurors had conducted themselves to help them evaluate the evidence, juror visits to the scene of the alleged accident, and so on. Even if we were to agree that the drafters of 606(b) intended external influences and extraneous prejudicial information to be separate concepts, a finding which we do not make, the alleged juror misconduct in this case does not rise to the level of extraneous prejudicial information as defined by the appellant. There is no evidence that the jurors in question did anything outside of the courtroom, such as talking to a lawyer or doing legal research, that would have led them to make the statement concerning the appellant's not testifying in his own defense.

12

denying Martinez's request for individual voir dire of the jurors regarding the effects upon the jury of mid-trial publicity concerning a co-defendant's voluntarily absenting himself. Voir dire of the jurors is necessary in such circumstances only if serious questions of possible prejudice could arise because of the trial publicity. See United States v. Aragon, 962 F.2d 439, 444 (5th Cir. 1992). The district court must perform a two-step inquiry to determine whether such serious questions exist. See United States v. Herring, 568 F.2d 1099, 1104-05 (5th Cir. 1978). First, the court must look at the nature of the media coverage, and determine whether it raises serious questions of possible prejudice. Id. Factors influencing the first inquiry include the timing of the media coverage of the trial proceedings, the nature of the material disseminated, and its potential effect on legal defenses. Aragon, 962 F.2d at 443. Second, the court must weigh the likelihood that the damaging material has in fact reached the jury. Id. Factors influencing the second inquiry include the significance of the media coverage and the nature, number, and regularity of warnings from the judge against viewing the coverage. Id.

At the outset of the trial, the judge admonished the members of the jury to avoid reading or listening to any media coverage that they may encounter concerning the trial. After the co-defendant disappeared, the judge granted Martinez a four-day delay to give his attorney an opportunity to find him. When that proved unsuccessful, the judge then admonished the jury not to consider

13

the co-defendant's absence as evidence of the guilt or innocence of any other defendant.  In this case, the news media had merely publicized an issue that the jurors had already been informed of by the judge himself -- that one of the defendants had absented himself.  In other words, even if jurors defied the judge's instructions and read or heard media accounts of the co-defendant's disappearance, there was no evidence that they would have learned much more than what the judge explained to them when he told them about the co-defendant's "voluntary absence" and admonished them that it was to have no bearing on their view of the remaining defendants' guilt or innocence.  Therefore, Martinez failed to establish the first element of the Herring test -- the potential for prejudice to his defense as a result of the publicity.  Because the judge did not find that there was a potential for prejudice caused by the media publicity concerning the other defendant's absence, he was not required to address the second part of the inquiry in order to determine that there were no serious questions of possible prejudice that would require a voir dire of the jury.[4]

Martinez's final contention in this area of the trial procedure itself is that the trial court judge erred by improperly commenting on the evidence in its answer to a question from the jury.  In that question, the jury asked:

---

[4]  In United States v. Manzella, we affirmed the defendant's conviction despite the trial court's failure to voir dire the jury on grounds that while the media account of the defendant's prior conviction was prejudicial, the chance of its actual influence over the jury's decision-making process was minute. 782 F.2d 533, 543 (5th Cir. 1986).

14

> May we have information concerning Government's Exhibit 84-A, 84-C, the Rolodex card? Where was the card found?

After consultation with both sides, the court responded, over defense counsel objection, and based on the Government's notes of Customs Agent, Raul Cardenas's, testimony:

> The testimony of November 14, 1991 of Raul Cardenas, U.S. Customs Agent, during his testimony 84-A and 84-C were found inside the van at the time of the arrest of Margarito Flores and John Kritzer...on July 24, 1987.

Martinez claims that this response was an improper comment on the evidence because the judge told the jury where Cardenas found the exhibits and based his answer on the recordation of Cardenas's testimony as supplied by the Government.[5] By merely reciting one portion of the trial testimony, however, in response to a narrow, factual question from the jury, the court was not endorsing the testimony as correct or incorrect, but was merely recounting what the witness had said about where the cards were found. The jury could decide whether or not to believe that witness's testimony, just as they could evaluate the credibility of testimony from all of the witnesses on both sides in the case. We cannot therefore say that the district court erred in its response to the question from the jury in this case.

C.  *Sentencing Guidelines Issues*

Martinez also raises several issues concerning the sentence the district court judge imposed. Martinez first argues that the

---

[5] Nothing in the record or in appellant's briefs indicates that the government's notes regarding Cardenas's testimony were inaccurate or incorrect.

sentencing guidelines were not applicable to his case. He suggests that because his last overt act in furtherance of the conspiracy occurred in July of 1987, four months before the sentencing guidelines became effective on November 1, 1987, the judge should not have applied the guidelines to this case. This contention is entirely without merit. The jury convicted Martinez for his participation in a conspiracy that, according to the superseding indictment charging Martinez, remained ongoing into 1990. Conspiracy is a continuing offense, and this court has affirmed application of the guidelines to a defendant who, while not participating in overt acts of the conspiracy after the guidelines took effect, failed to take affirmative actions to withdraw from a conspiracy that remained ongoing after the guidelines became effective. See United States v. Puma, 937 F.2d 151, 158 (5th Cir. 1991), cert. denied, 112 S.Ct. 1165 (1992). The United States Supreme Court defined such "affirmative acts" as those acts that are "inconsistent with the object of the conspiracy and [that are] communicated in a manner reasonably calculated to reach co-conspirators...." United States v. U.S. Gypsum Co., 438 U.S. 422, 464-65, 98 S.Ct. 2864, 2887-88, 57 L.Ed.2d 854 (1978). Martinez took no such affirmative actions in this case, and thus remains responsible as a co-conspirator for the all of the acts charged to the conspiracy, which continued into 1990. There was therefore no retroactive application of the sentencing guidelines to Martinez in this case. The district court correctly looked to the sentencing guidelines in sentencing Martinez.

16

The appellant also claims that the district court erred in its sentence by miscalculating Martinez's criminal history category. The district court judge's calculation of a defendant's relevant criminal history category is a finding of fact that we review for clear error. See U.S. v. Mejia-Orosco, 867 F.2d 216, 221 (5th Cir. 1989). A court's factual finding is not clearly erroneous if it is plausible in light of the record read as a whole. United States v. Sanders, 942 F.2d 894, 897 (5th Cir. 1991).

Martinez claims that the district court miscalculated his relevant criminal history category under U.S.S.G. § 4A1.2(a)(2), by counting two of his prior convictions as separate convictions rather than as "related cases" which under the guidelines would only be counted as a single prior conviction. United States Sentencing Commission, Guidelines Manual, § 4A1.2(a)(2)(Nov. 1993). Martinez contends that because the two cases were set on the sentencing docket for the same day, and were tried together with the involvement of the same judge, prosecutor, and defense attorney, that they are related cases that should only count as one prior conviction. In truth, however, the record indicates that there were two separate offenses. On February 28, 1977, Martinez was convicted of possession with intent to distribute marijuana and was sentenced to probation. In June of 1977, he was convicted for being a felon in possession of a firearm. Because of this subsequent conviction, Martinez's probation for the first offense had to be revoked. It was the revocation of Martinez's probation for the prior marijuana conviction that was scheduled for the same

17

day that his sentence was imposed on the conviction for illegal possession of a firearm.  In effect then, there were three prior sentences.  Martinez was initially sentenced to probation for his original marijuana conviction.  Several months later, after he was convicted on the subsequent firearms charge, he was sentenced *both* for the possession of a firearm, *and* for the violation of his probation on the marijuana conviction.  The district court did not therefore err in counting these two offenses as separate convictions and calculating Martinez's criminal history as a category IV rather than a category III.

The appellant also contends that the lower court erred in calculating Martinez's relevant conduct under the sentencing guidelines by using an incorrect quantity of drugs as the figure on which to base its calculation.  Appellant argues that the court should have considered only the equivalent of 174,000 kilograms of marijuana in calculating his offense level.  The district court has broad discretion in considering the reliability of the submitted information regarding the quantities of drugs involved. United States v. Kinder, 946 F.2d 362, 366 (5th Cir. 1991).  We will overrule the factual findings of the district court on sentencing issues only if such findings are clearly erroneous. Id.  In this case, we need not address whether the district court improperly used any amounts in excess of 174,000 kilograms.  According to the 1987 version of the Sentencing Guidelines,[6] under which Martinez

_____

[6]     The 1987 version of the Sentencing Guidelines are actually more generous to Martinez than the current Guidelines, which would have placed him at an offense level of 40 for any

18

was sentenced, anything over 10,000 kilograms of marijuana would result in the highest offense level at the time -- 36. United States Sentencing Commission, <u>Guidelines Manual</u>, § 2D1.1 (May 1987). Since appellant does not dispute the amount of drugs the court used in its calculation up to 174,000 kilograms, the district court used the proper offense level in calculating Martinez's sentence.

Martinez's final contention in this appeal is that the district court erred in failing to adjust his offense level downward pursuant to U.S.S.G. §§ 3B1.1-3B1.4. The sentencing guidelines allow a sentencing judge to effect a downward adjustment for a defendant who plays a mitigating role in the offense for which he was convicted. U.S.S.G. § 3B1.2. As stated earlier, we review a district court's factual findings in preparation for sentencing under the clearly erroneous standard. <u>Mejia-Orosco</u>, 867 F.2d at 221. In this case, Martinez argued that he deserved a downward adjustment in his sentence because, as defined in U.S.S.G. §§ 3B1.2(a)(b), he was either a "minimal" participant or a "minor" participant in the conspiracy for which he was convicted of being involved. The Application Notes explain that a defendant's "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." U.S.S.G. § 3B1.2, Application Note 1. As an example of a defendant who may be described as a minor

_____

amount of drugs between 100,000 and 300,000 kilograms. U.S.S.G. § 2D1.1(c)(2)(1993).

participant in a conspiracy for guidelines purposes, the Application Notes describe a person "who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." U.S.S.G. § 3B1.2, Application Note 2. Martinez contends that because he did not know what he was delivering, and was basically an innocent participant in this conspiracy, his role was either "minimal" or "minor." The jury, however, clearly found him guilty of participation in the conspiracy as charged in this case, which by definition entailed the jury's finding that Martinez had knowledge of, and voluntarily participated in, the ongoing transportation of entire truckloads of narcotics. The judge's determination that the facts of this case did not warrant a downward adjustment was therefore not a clearly erroneous finding.

III. CONCLUSION

Finding no error, we AFFIRM the district court on all issues raised on appeal.