**Jerry D. DORMINEY, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Civ. A. No. 80–84–ALB.**

United States District Court, M. D. Georgia, Albany Division.

Aug. 26, 1982.

Oteri & Weinberg, Boston, Mass., for petitioner.

Samuel A. Wilson, Macon, Ga., for respondent.

## ORDER

OWENS, Chief Judge.

Petitioner Jerry D. Dorminey moved this court, pursuant to 28 U.S.C. § 2255, on September 17, 1980, to vacate and set aside the sentence of imprisonment now being served that was imposed upon him by this court on October 10, 1978, and affirmed upon appeal by the Fifth Circuit Court of Appeals. *United States v. Herring and Dorminey,* 602 F.2d 1220 (5th Cir. 1979). The motion is based upon the following grounds:

A. Denial of effective assistance of counsel.

B. Denial of rights to fair trial by an impartial jury and to confront and cross-examine witnesses, in violation of Fifth and Sixth Amendments to the United States Constitution.

C. Denial of right to fair trial in violation of Fifth and Sixth Amendments because of appearance of lack of impartiality by court.

In support of ground B petitioner Dorminey set forth the following facts:

"... On September 27, 1978, the third day of my trial, some of the jurors in the case were brought from the courtroom to the first floor of the courthouse. As they alighted from the elevator they passed by two U.S. Marshals assigned to my trial. Juror William L. Rushing, Jr. heard one Marshal say to the other: 'The judge says they [I and co-defendant Herring] are both guilty. One is as guilty as the other.' Rushing's affidavit is appended hereto and marked 'J'."

The affidavit of William L. Rushing, Jr. stated:

"Now comes William L. Rushing Jr. who deposes and says the following:--------------------------- My name is William L. Rushing Jr., I am married, have two children and reside at 12 Lauren St. Richmond Hills, Georgia.---------------------------- On the dates of Sept. 25, 1978 through Sept. 30, 1978, I was a member of the jury hearing the case of United States vs. Jerry Dorminey and Robert L. Herring.--------------------------------------------- During the week long trial, I became aware of, and familiar with people in the court house by observing them on a day to day basis.---------------------------- I recall that on Wednesday Sept. 27, 1978, myself and other jurors were taken on the elevator to the first floor of the court house. As we were getting out of the elevator, I observed two males dressed in plain clothes. I recognized them as U. S. Marshalls that I had seen performing their regular duties in the courtroom. I am unable to identify either marshall by name. Upon getting out of the elevator, I heard one U. S. Marshall say to the other, 'The judge says they are both guilty, one is as guilty as the other.'-------------------------------- I give this affidavit freely and voluntarily, without reward or compulsion from any persons whomsoever. This affidavit is being given to Arthur P. MacDonald whom I know to be an investigator employed by the law firm of Oteri & Weinber.------------------------

/s/ Arthur P. MacDonald  /s/ William L. Rushing, Jr.
June 20, 1980                 6–20–80
Witness                          Affiant"

Petitioner's motion was also supported by a memorandum of law prepared by his habeas attorneys Oteri and Weinberg of Boston, Massachusetts.

By order dated October 21, 1980, the court disposed of petitioner's contention that his trial was unlawfully moved to Savannah, Georgia and presided over by this trial judge and directed the United States to respond to all remaining contentions. Following the government's response of December 18, 1980, the court, by order of January 15, 1981, directed:

"At 9:30 A.M., February 20, 1981, in the courtroom of the United States District Court for the Southern District of Georgia at Savannah, Georgia, this court will hold an evidentiary hearing to investigate petitioner's 28 U.S.C. § 2255 claim that the jury which convicted him was impermissibly influenced by remarks allegedly made in the hall of the courthouse by a Deputy United States Marshal.

"Each juror who served and participated in arriving at a verdict is ordered to appear and testify separately under oath in response to questions to be asked of each juror by the trial judge. Before and during questioning each counsel in writing may submit suggested questions to be asked by the court; counsel will not be permitted to interrogate the jurors."

On January 22, 1981, petitioner moved to expand the scope of the February 20, 1981, hearing to include inquiry into petitioner's claim of ineffective assistance of counsel and the court on January 26, 1981, denied that motion because "those contentions can be determined fully and fairly from the files and records ..."

On February 20, 1981, an evidentiary hearing was held in Savannah, Georgia. During that hearing every trial juror and alternate juror testified separately in chambers in response to questions asked by the court. Counsel for petitioner and the government were present and permitted to suggest questions to be asked.

On October 23, 1981, and June 9, 1982,[1] additional evidentiary hearings were held in Savannah. All evidence having been heard and considered, it is now the court's responsibility to decide petitioner's motion.

### Federal Habeas Statute

The federal habeas statute, 28 U.S.C. § 2255, provides:

"A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution of laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"A motion for such relief may be made at any time.

"Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

"A court may entertain and determine such motion without requiring the production of the prisoner at the hearing."

\* \* \* \* \* \* \*

---

1. An evidentiary hearing scheduled for November 30, 1981, was stayed by the Eleventh Circuit Court of Appeals to give the court time to consider petitioner's application for a writ of mandamus and was rescheduled when that stay was vacated.

■ Pursuant to that statute and the Federal Rules Governing Section 2255 proceedings, the evidentiary hearings that have been held were ordered and limited to the issue of whether or not petitioner's jury was impermissibly influenced by remarks of a Deputy United States Marshal overheard during the trial. In refusing an evidentiary hearing on other issues the court was mindful that evidentiary hearings must be held to resolve bona fide factual issues that are possibly relevant to the issues set forth in petitioner's motion. *See, Stokes v. United States,* 652 F.2d 1 (7th Cir. 1981) and *Dugan v. United States,* 521 F.2d 231 (5th Cir. 1975).

■ As the Second Circuit Court of Appeals said in *Dalli v. United States,* 491 F.2d 758, 760:

"... Section 2255 requires a hearing to resolve disputed issues of fact 'unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.' See *Fontaine v. United States,* 411 U.S. 213, 215, 93 S.Ct. 1461, 1462, 36 L.Ed.2d 169 (1973). In making that threshold determination the court looks primarily to the affidavit or other evidence proffered in support of the application in order to determine whether, if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief. Mere generalities or hearsay statements will not normally entitle the applicant to a hearing, *D'Ercole v. United States,* 361 F.2d 211, 212 (2d Cir.), cert. denied, 385 U.S. 995, 87 S.Ct. 610, 17 L.Ed.2d 454 (1966), rehearing denied, 385 U.S. 1032, 87 S.Ct. 758, 17 L.Ed.2d 680 (1967); *United States v. Catalano,* 281 F.2d 184 (2d Cir.), cert. denied, 364 U.S. 845, 81 S.Ct. 88, 5 L.Ed.2d 69 (1960); *Paroutian v. United States,* 395 F.2d 673, 674 (2d Cir. 1968), cert. denied, 393 U.S. 1058, 89 S.Ct. 700, 21 L.Ed.2d 700 (1979); *Holland v. United States,* 406 F.2d 213, 216 (5th Cir. 1969); *Barnett v. United States,* 439 F.2d 801, 802 (6th Cir. 1971), since such hearsay would be inadmissible at the hearing itself. *United States v. Pisciotta,* 199 F.2d 603, 607 (2d Cir. 1952); *Brady v. United States,* 404 F.2d 601, 602 (10th Cir. 1968), aff'd, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). The petitioner must set forth specific facts which he is in a position to establish by competent evidence. *Machibroda v. United States,* 368 U.S. 487, 495–496, 82 S.Ct. 510 [514], 7 L.Ed.2d 473 (1962). ..."

### Ineffective Assistance of Counsel

Petitioner in his motion and personal affidavit contends that he was denied his constitutional right to "counsel reasonably likely to render and rendering reasonably effective assistance." *Mackenna v. Ellis,* 280 F.2d 592, 599 (5th Cir. 1960), modified, 289 F.2d 928, cert. denied, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961)." *United States v. Hughes,* 635 F.2d 449, 451 (5th Cir. 1981).

Factually he asserts that he retained Peter Zack Geer to represent him; that Mr. Geer met with him only three times before trial; that Mr. Geer failed to interview witnesses Danny Hatcher, Frank Harris and Kenneth Hopkins; that Mr. Geer drank too much before and during the trial; and that Mr. MacDougald, Mr. Geer's partner, had to take over the case on the eve of trial. He further complains of Mr. Geer drinking too much after court recessed each day, of his failure to have him take a polygraph test, and of the manner in which Mr. Geer presented his case to the court and jury.

In considering petitioner's complaints this trial judge again read the 1,249 page trial transcript, the sentencing transcript and the court file containing the indictment, motions and other papers.

Mr. Dorminey asserts that he hired Mr. Geer and says that Mr. Geer's performance was so poor and his drinking so bad that his unprepared associate, Mr. MacDougald, had to take over at the last minute and defend him. The file and transcripts tell a different story.

Indicted on July 21, 1978, with co-defendants Robert L. Herring, Danny Hatcher and Carlton Dixon, petitioner appeared on August 3, 1978, represented by Peter Zack Geer and Dan MacDougald and entered a

plea of not guilty. Both lawyers signed their names as witnesses to the entry of the plea by petitioner. On August 15, 1978, petitioner, by his attorneys Peter Zack Geer and Dan MacDougald, filed (1) a motion to sever and for relief from prejudicial joinder, (2) a brief of law in support of said motion, (3) a *Brady* motion, and (4) a discovery motion. On August 25, 1978, petitioner, by his said attorneys, joined in the government's motion for handwriting exemplars of co-defendants Robert L. Herring, Danny J. Hatcher and others. As a result of these motions the trial of petitioner on Count Three was severed from the trial of the remaining charges, handwriting exemplars were furnished the government and petitioner and discovery to the extent permitted by law was engaged in. Petitioner, through his said attorneys, joined in co-defendant Herring's motion for change of venue outside this district on account of pretrial prejudicial publicity and the trial was ordered held in the Savannah Division of the Southern District of Georgia on September 25, 1978, at 9:30 a.m.

From the beginning of petitioner's trial at 9:30 a.m., September 25th, until the jury began its deliberations at 3:02 p.m., Saturday, September 30th, petitioner was represented by both Peter Zack Geer and Dan MacDougald. Mr. Geer, a noted trial lawyer and former Lieutenant Governor of this state, served as lead counsel and from beginning to end made all major objections and decisions. Mr. MacDougald ably assisted Mr. Geer. Faced with nine counts of interstate transportation of checks secured by fraud from major financial institutions and the petitioner's admissions to a grand jury that he signed all the documents for admitted phony sale and lease transactions and received some $900,000.00 from the checks issued by financial institutions in reliance on such phony documents, Mr. Geer and Mr. MacDougald chose the only possible defense—they attempted to convince the jury that petitioner did all that he said he did because he was duped into doing so by his co-defendant, convicted felon and conman Robert L. Herring; as such he acted, they vigorously argued, without the requisite criminal intent.

In this court's considered judgment petitioner has only one justifiable complaint and that is that his well-prepared, experienced trial lawyers, having done everything possible in his behalf, did not succeed in convincing this jury to disregard the overwhelming evidence of his guilt and pardon him by finding him not guilty. That Peter Zack Geer and Dan MacDougald were unable to accomplish such a difficult, almost impossible task in no way indicates that petitioner received less than the effective assistance of counsel that he is constitutionally entitled to.

This court knows nothing of Mr. Geer's after-court conduct other than what is set forth in conclusory fashion in petitioner's affidavit and exhibits. On the other hand, this court, from a careful reading of the transcript, did not find anything that Mr. Geer did or failed to do that might evidence that his performance as a trial lawyer was affected by his drinking between the time court recessed in the evening and began again in the morning.

■ As the transcript shows, petitioner did not complain of Mr. Geer's after-court drinking prior to this jury finding him guilty, his being found not guilty as to Count Three by a second jury and his conviction being affirmed by the Fifth Circuit Court of Appeals. During that entire time he was represented by Peter Zack Geer and Dan MacDougald. Petitioner had a duty to notify this court and/or the Fifth Circuit Court of Appeals of the alleged inadequacies that he now says he knew about. *See, Chapman v. United States,* 469 F.2d 634 at 636 (5th Cir. 1972). Having said nothing, he cannot now complain.

Petitioner's specific complaints being clearly contradicted by the trial transcript and record, it is unnecessary to go into greater detail. Suffice it to say, there is no possible merit to petitioner's complaint of ineffective assistance of counsel.

### Appearance of Partiality

■ On appeal, Herring and Dorminey each challenged the "fairness" of their trial.

602 F.2d at 1223. The allegation that the conduct of this trial by this trial judge created an appearance of partiality for the prosecution is nothing more than an effort to re-argue the decision of the court of appeals that petitioner received a fair trial. Issues considered and disposed of by the court of appeals are not reviewable a second time by a 28 U.S.C. § 2255 motion. *See, United States v. Johnson,* 615 F.2d 1125 (5th Cir. 1980). Even if this specific complaint was not considered as a part of petitioner's overall contention of being unfairly tried, this specific complaint was known to defendant and his counsel, is based upon the trial transcript, could have been presented upon appeal and therefore may not now be raised by motion to vacate. *See, United States v. Brest,* 266 F.2d 879 at 881 (3rd Cir. 1959), and *United States v. Gironda,* 283 F.2d 911 at 912 (2nd Cir. 1960).

### Denial of Rights to Fair Trial By An Impartial Jury and to Cross-Examine Witnesses

■ Because of the already quoted affidavit of trial juror William L. Rushing, Jr. the court held evidentiary hearings on the issue of whether or not during the trial a United States Marshal was overheard by juror Rushing as the marshal told another marshal "the judge says they are both guilty, one is as guilty as the other;" and if so, were the overheard remarks an impermissible and presumptive prejudicial extrajudicial influence[2] on the trial jury requiring the grant of a new trial. While some testimony was initially taken by deposition, all witnesses were ultimately presented to and testified before this trial judge. Having heard all witnesses and judged their credibility, the court makes the following findings of fact and conclusions of law.

### Findings of Fact

Trial juror William L. Rushing, Jr. did not overhear any United States Marshal, any Deputy United States Marshal or any other person not serving on the trial jury say anything concerning this trial judge's

opinion of the guilt or innocence of petitioner Dorminey or his co-defendant Robert L. Herring.

### Conclusion of Law

Petitioner received a fair trial before an impartial sequestered jury that based its verdict upon and only upon the evidence presented upon the trial of the case.

### Basis for Credibility Choice

While not required to do so, it nevertheless seems appropriate for the basis of the court's rejection of the testimony of juror Rushing and the corroborating testimony of former Chief Deputy Marshal Pou to be recited.

### Testimony of William L. Rushing, Jr.

Trial juror Rushing's affidavit is dated June 20, 1980. It states:

\* \* \* \* \* \*

"I recall that on Wednesday Sept. 27, 1978, myself and other jurors were taken on the elevator to the first floor of the court house. As we were getting out of the elevator, I observed two males dressed in plain clothes. I recognized them as U.S. Marshalls that I had seen performing their regular duties in the courtroom. I am unable to identify either marshall by name. Upon getting out of the elevator, I heard one U.S. Marshal say to the other, 'The judge says they are both guilty, one is as guilty as the other.'"

\* \* \* \* \* \*

On October 23, 1981, juror Rushing testified under oath and in response to questions of the court said that he overheard one person he understood to be a United States Marshal say to another person he thought was also a United States Marshal that "[t]he Judge said Dorminey was guilty, too." (Tr., p. 37, 38 and 43). The quote is obviously different from that found in his affidavit.

---

**2.** *See, United States v. John C. Herring,* 568 F.2d 1099 (5th Cir. 1978).

Juror Rushing also testified that on the date in question he "heard a policeman or something like that said they suspected a bomb or something like that." (Tr. p. 39; see also p. 41, 42). In his affidavit he states Wednesday, September 27th. The trial transcript fixes the date and time that the trial was recessed, the jury was removed, and the building was vacated at 11:40 a.m., Friday, September 29th. (Tr. p. 996).

Juror Rushing gave his affidavit to a Boston private investigator, Arthur P. McDonald. As to his communicating with Mr. McDonald he testified:

"Q Mr. Rushing, when was it that you were first contacted by anybody concerning their desire to ask you about your having served as a juror in this case?

A Nobody didn't contact me.

Q What happened concerning your talking with someone concerning your having served as a Juror?

A Oh, I was coming through—see, like our office is over here, you know, on Lake Patton. I was coming from over that way and I was going through town to K-Mart and I stopped over here somewhere at a motel over here or something to pick up a newspaper and I went in to get some change and I overheard a guy there talking about the Dorminey case, you know, when I went in to get some change, and it kind of puzzled me, you know, what was going on. So, I thought about it and I called him.

Q Then what transpired from that point?

A What do you mean what transpired?

Q Well, I mean, what happened between you and him?

A Well, I just talked with him about it, you know, what I had heard.

Q Well, specifically, just tell me the best you recall what he said and what you said?

A Well, when I overheard him—his conversation, he was talking to the receptionist, I think it was, at the desk at the motel there where I had stopped out here, and—

Q You mean at the Howard Johnson's Motel?

A No, it wasn't a Howard Johnson's, it was a—I think it was the Downtowner—I believe that's what it was, and I overheard him say something another about he was getting some bar bills about the Dorminey case, and you know, that struck my ear. So, I just sort of hung around, you know, I was interested in it being I was on the case, and I heard him give his name and where he was staying at, and I went home and I thought about it. I was thinking about it and I said, well, I am going to call him and ask him about it because I had heard where he was staying at.

Q How did you know his name?

A I heard him when he was talking to the receptionist.

Q Did he give his name?

A Yes, sir, he gave his name to the receptionist and told her who he was because he was asking her about the Dorminey case.

Q Where did you talk to him?

A See, I called him on the telephone at his motel. He told me where he was staying—he told her where he would be staying at, so I contacted him. I called him that night."

On June 9, 1982, juror Rushing again testified as to what he heard, to wit:

"A I heard one guy saying to the other, says, 'The Judge says they're both guilty; one is just as guilty as the other.'" (Tr. p. 7).

Juror Rushing again fixed the day and time by remembering the interruption of the trial on account of a bomb threat. (Tr. p. 6).

Asked to reconcile the differences in his testimony as to what he overheard, he was unable to do so. (Tr. pp. 11, 12).

As to meeting the investigator juror Rushing testified:

"A I ran in—well, I say ran into him, I didn't run into him, either. One day when I had got off work, I was coming through Savannah and I don't remember

where I was going now, I was looking for something or other and I stopped to get a paper.

Q   In the afternoon?

A   Huh?

Q   In the afternoon, afternoon paper?

A   Yeah, well, paper, the day's, the Morning News or Evening Press, I don't remember which paper it was in and I stopped at somewhere over here, it was at a motel or something or other and I went in, you know, and got a paper and I overheard him talking with, yeah, the receptionist, saying that he was staying at—you know, working on the Dorminey case or something like that, to that effect, and you know, I remember him saying it and so, you know, I called him and told him about it.

\*    \*    \*    \*    \*    \*

Q   And stopped at some motel?

A   Now, I didn't—Now, I didn't come across the Talmadge Bridge and go to the motel.  I had to take my truck into the yard over there where we parked at.  I got in my own car and I stopped by, well, somewhere over here, a motel and got a paper that's, you know, where I heard him at.

Q   All right, do you remember what motel it was?

A   Seemed like it was the Downtowner or something or other, I'm not positive, to be honest with you.  I can't remember exactly what it was.

Q   You parked your car, went inside to get a newspaper?

A   Yeah, I got a paper.

Q   Did you get a newspaper?

A   Yeah.

Q   Inside?

A   I guess that's where I got it at. That's what I went in for.

Q   And you heard the investigator.

A   Talking with the—

Q   Do you remember the guy's name?

A   Not now.  Seemed like it was a funny kind of a—his last name was, you know, kind of a funny name.  I can't remember exactly.

Q   Now, tell us again what you heard this investigator say to the—excuse me, I presume he was talking to the person at the desk?

A   Yeah, that's who.

Q   Is that right?

A   Yeah.  Well, I understood him, if I'm correct, that he was working on the Dorminey case and that he would be staying at the 1790 Club or something.  He'd come by to—seemed like he'd come by to pay something or something like that, I don't remember exactly now, but anyway, I understood him to say he would be staying at the 1790 Club and I called there, you know, not from Savannah, after I got home.

\*    \*    \*    \*    \*    \*

Q   MR. WILSON:  Now, you went home to Richmond Hills?

A   Right.

Q   And did you call this man?

A   Right.

Q   You called him?

A   Right.  I think I told you that the last time, didn't I, on that paper there, that's what I got wrote down that I called him?

Q   I think you did.  And what did you tell this guy?

A   I told him, you know, that I'd overheard him, you know, and—yeah, I'd overheard him talking with the receptionist or desk clerk, whatever you call, and that, you know, he was working on the Dorminey case and I don't remember exactly what I did say to him then.  It seems like I remember telling him, you know, that I knew something, you know, that I had heard something about it.

Q   Heard something about what?

A   Well, you know, just what I said a while ago about the two guys saying, you know, something about Dorminey.

Q   Would you say that again?

A   About the two guys saying something about Dorminey or whatever.

Q   All right, you called this guy.

A   Huh?

Q   You called this fellow on the telephone?

A  Right.

Q  And did you tell him that you served on the jury?

A  Right, yeah. Like I say, you know, I don't remember, you know, word-for-word what I told the man, you know, right then.

Q  How many private investigators you ever talked to?

A  He's about—I guess he's about the only one I've ever talked with.

Q  How many times you call up somebody at a motel that you don't know?

A  Well, I don't usually do that either but I felt like that I, you know, after I—under that circumstances, if it had been anything else, I don't guess maybe something like that, I probably wouldn't have, you know, if I wasn't involved in it. But I felt like, you know, that I was involved in it and heard something and I thought, you know, that I felt like that something, you know, should be done, that I ought to, you know, I had a right to—

Q  Something should be done about what?

A  That I, you know, that I had heard something then, you know, and it's like I told the Judge, I think, the last time I was up here. Yeah, I was scared, you know, after that, you know, and I think there was one, if I can remember correctly, that one guy had went missing or got killed or something like that. It was kinda mentioned in the trial or something and you know, I was scared then. I didn't know. I'd done what I did the best way I knew how to do it when I was sitting over there on that jury but—and I didn't say nothing then, you know, cause I didn't know what to do.

Q  Well now, were (sic) you scared when you went out the building?

A  Yeah, I was scared when I went out—

Q  You were scared of that bomb though, right, or were you scared about the bomb or—

A  Yeah.

Q  Or two one-hundred and seventy-pound people talking to one another?

A  I was scared about the bomb.

Q  The bomb. Okay.

A  I wasn't scared of the two men.

Q  All right, that's fine. So now, you heard this statement sometime in September of 1978, and you didn't discuss it with anybody, including your wife, until June of 1980 when you called this investigator up on the telephone?

A  Right. I called him at the 1790 Club, I think is what it is."

(Tr. pp. 13–20).

The investigator, Arthur P. McDonald of Boston, Massachusetts, then testified. As to meeting juror Rushing he stated:

"Q  Now during your trip to Savannah, did you have occasion to make the acquaintance of a Mr. William Rushing?

A  Yes, sir.

Q  And how did you happen to meet him?

A  I was checking into the 1790 Hotel and received a call from Jan Vick who was Mr. Dorminey's secretary and, I think, girlfriend. She advised me that there was a juror that had some information about the Dorminey trial and she said his name was William Rushing and wanted me to contact him.

Q  Jan Vick?

A  Yes, sir.

Q  And at that time Jan Vick was in Moultrie?

A  I believe she was. She telephoned me.

Q  And told you that this fellow Rushing had some information?

A  Yes, sir.

Q  Did you call Rushing?

A  No, sir. I said that I couldn't contact the juror, that he would have to get in touch with me and that she could tell Mr. Rushing that if he had information and wanted to come forward and contact me, he should call me at the 1790.

Q  Did he call you?

A  Yes, sir.

THE COURT: How long between the time that you talked to Ms. Vick and the time you talked to him, how long was it between?

THE WITNESS: I think I got a call back in about within two hours.

Q MR. WILSON: And on the first telephone conversation with Mr. Rushing, what did he tell you?

A I told him I didn't want to speak over the telephone, that I would like to meet him in person and that I would like to set up a meeting with him for the next day or whenever was convenient for him. He told me that he worked in the daytime, that he couldn't meet me until the evening. I made an appointment at that time to go to his house. He gave me directions to the house and that was the gist of that conversation."

(Tr. pp. 29–30).

Mr. McDonald also testified that according to his notes, which he did not have with him, he received the phone calls from Jan Vick and juror Rushing on June 15th. He went to Mr. Rushing's home on June 16th, he and his fiance had dinner with Mr. and Mrs. Rushing and their children and he and Mr. Rushing discussed what Mr. Rushing knew about this case. The handwritten affidavit was not signed that evening. Instead Mr. McDonald and his fiance met the Rushings again on the evening of June 20th, took them to dinner at the Plantation Restaurant and got Mr. Rushing to sign his two-page affidavit.

On the same occasion—June 9, 1982—juror Rushing in answering a series of questions as to why he waited some two years to say anything about this incident stated:

"Q Can you tell us why you didn't say anything to anybody about this statement for this two-year period?

A I was scared. I didn't want to say nothing, or I won't say that I didn't want to say nothing. I was scared to say anything. I didn't know what was liable to happen. I got a wife and I got two kids and I think a lot of 'em.

Q Scared?

A Yeah, I was scared.

Q Scared of who?

A Well, when they go mention bombs or something like that, I ain't gonna hang around to see who's holding the bomb or nothing to throw it or whatever they gonna do with it or plant it or whatever. I wasn't gonna go up there and say, yeah, I'm the one, you know, so-and-so, throw the bomb at me or something.

Q Well, who were you scared of?

A Well, I can't say nobody in particularly, you know, that I was scared of but you hadn't ever been scared and not exactly know who you were scared of?

Q Well, did you tell anybody that you were scared?

A No, I didn't tell nobody I· was scared.

Q Well now, what kept you from being scared to the extent that you told this fellow from Boston about the statement?

A Well, when I, you know, like I say, when I went to pick up the paper and I heard him talking, you know, to the receptionist who he was working with or for, whatever it was, and he was gonna be in town or something or other, well, you know, I felt like regardless of how I felt, you know, that something ought to be said, you know, that somebody ought to say about it. If they don't, you know, I know there's other people that things have happened to them or supposed would happen that didn't really happen and I said, if there's any possible way, you know, that this would clarify anything, you know, I'm gonna say it and so I did.

Q Well—

A See, I'm not trying to prove his, you know, his innocence to nobody and I don't think in my statement that I made that point that I was trying to, but I was just letting you folks, or letting him know cause *I knew what was gonna happen, that more than likely there was going to be another trial* or not another trial but, you know, this was gonna come up.

Q How did you know that?

A Well, *it just stands to reason, you know, that it would happen after something like that was said* and, you know, I felt like that, you know, that you all should know about it.

Q ·Some two years later?

A Well, like I said, you know, *I was worried about it,* I didn't know whether to do it then or not and it did, it took me a while to make my mind up, you know, that I should do it and I did." (emphasis added).

(Tr. pp. 22–24).

These irreconcilable differences on material matters, the court's observations of each witness as he testified and a consideration of each witness' total testimony caused the court to conclude that juror Rushing is not to be believed when he says he overheard two men who were apparently United States Marshals talking about this case.

This judgment is reenforced by the testimony of the thirteen other jurors that they each heard nothing about the case outside the courtroom and that none of their fellow jurors told them of having heard anything. If a United States Marshal had said something and it was overheard by one juror, it is most unlikely that the other thirteen jurors—all were together at the time according to Mr. Rushing—would have heard nothing and that the one juror who did hear it would not mention what he overheard to any other juror.

### Testimony of Chief Deputy Samuel Pou

Samuel Pou at the time of this trial was Chief Deputy United States Marshal for the Southern District of Georgia. His then boss, United States Marshal James C. Murphy, was appointed first by the district court and then by President Carter. After this trial Mr. Pou, around October 19 or 20, 1980, was transferred by the Marshals Service from the Southern District of Georgia back to Richmond, Virginia. While Mr. Pou would have the court believe that his transfer resulted from a mutual agreement between him and his boss, Marshal Murphy, to permit him to return to the area in which he hopes to retire, it is the court's belief that Mr. Pou's transfer was a demotion which resulted from Marshal Murphy, on account of dissatisfaction with Mr. Pou's duty performance, asking the Director of the Marshals Service during a personal conversation to transfer Mr. Pou. Mr. Pou knew of the Marshal's dissatisfaction because the Marshal discussed it with him, and he either was told or concluded that was the reason for his transfer. *See* Mr. Pou's deposition of May 15, 1981, and his testimony on October 23, 1981, and Marshal Murphy's deposition of May 14, 1981, and testimony on October 23, 1981.

Mr. Pou, on January 15, 1981, was told in a telephone call from Chief Deputy Charles Bailey of Mr. Rushing's affidavit and of this court's order setting the matter down to be heard. However, it was not until February 23, 1981, that he wrote a letter to this judge advising that he heard Marshal Murphy say exactly what juror Rushing in his affidavit had alleged he heard.

Juror Rushing in his testimony repeatedly fixed the date and time that he overheard the Marshal's statement as the time and date the jury was being taken out of the building on account of the bomb scare. Mr. Pou, while he said he could recall verbatim what Marshal Murphy said, couldn't recall when he said it. On the other hand, Mr. Pou did remember the bomb scare and did recall that he was assigned to check the third floor of the courthouse after everyone left. When he got downstairs on the first floor where the conversation supposedly took place, he also recalls that the jury had already been taken out of the building. *See,* October 23, 1981, transcript, pp. 47–50. Mr. Pou by his own testimony could not have been physically present on the first floor of the building at the time Mr. Rushing says he overheard a conversation, and therefore cannot corroborate or "back up" the juror's testimony.

Dissatisfied with his demotion and transfer in October, 1980, Mr. Pou between January 15th and February 23, 1981, convinced himself that more than likely Marshal Murphy said exactly what Mr. Rushing claims to have overheard. Having listened care-

fully to Mr. Pou and all other witnesses, it is this court's belief that Mr. Pou did not hear Marshal Murphy or any other Deputy Marshal say anything within earshot of the jury as to this judge's opinion of petitioner's or defendant Herring's guilt or innocence.

## Conclusion

There being no merit to any of petitioner Dorminey's grounds for the granting of a 28 U.S.C. § 2255 motion, said motion is DENIED in its entirety.