# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

m 99-40159

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

EUFEMIO MORENO-GARCIA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
(L-98-CR-380-2)

_____

August 9, 2000

Before SMITH and DENNIS, Circuit
Judges, and ROETTGER, District Judge.[*]

JERRY E. SMITH, Circuit Judge:[**]

Eufemio Moreno-Garcia appeals, on
grounds of insufficient evidence, his conviction

[*] District Judge of the Southern District of Florida, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

of conspiracy and possession with intent to distribute marihuana. Because he did not renew his motion for acquittal at the close of all evidence, we review only for plain error. Finding none, we AFFIRM.

## I.

Moreno-Garcia ("Moreno"), Juan Serna-Arrambide ("Serna"), and Carlos Rios were charged in a two-count indictment with conspiracy and possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(D), and 18 U.S.C. § 2. Serna and Rios pleaded guilty to the possession count, and the government dismissed the conspiracy count as to them. A jury found Moreno guilty on both counts.

On April 3, 1998, Serna was attempting to enter the United States from Nuevo Laredo, Mexico, when Customs agents discovered approximately fifty pounds of marihuana secreted in a hidden compartment under the driver's seat of the truck he was driving. The inspectors had noticed a zipper in the seat that opened from the driver's side. The seat was hard as a rock and unusually high. They opened the zipper on the seat and found a tray containing foam, baby powder, and vacuum-sealed plastic packages of marihuana.

Serna indicated his desire to cooperate and gave the inspectors a slip of paper with the name "Rogelio" and "331-0438" written on it. Serna said that he had been approached by a man he did not know, who gave him $177 to cover expenses and asked him to drive the truck to Dallas and to call the phone number upon arrival. Serna told Special Agents Damien Vega and Eric Wilson that he did not know what was in the truck, but that he was being paid $250 to drive it either just across the border or to Dallas.

Serna then changed his story, acknowledging that he knew there was marihuana in the truck and stating that he was being paid $1500 to deliver it to Rogelio in Dallas and then drive back to Nuevo Laredo with an unknown amount of currency. When he arrived in Dallas, he was to call Rogelio at the number on the paper.

The agents and Serna proceeded to Dallas with the truck and attempted a controlled delivery. Before noon on April 4, the agents parked the loaded truck outside of Grandy's Restaurant, and Serna called the number for Rogelio, saying that he had arrived in Dallas and needed someone to pick him up because he did not know his way around Dallas. They agreed to meet at Grandy's.

Meanwhile, agents conducted surveillance of a residence at 702 Ely Street, Dallas, to which the phone number on the slip of paper was assigned. Shortly after Serna's phone call, three Hispanic males left 702 Ely Street in a white car with yellow license plates. The group included Moreno, a 20-year-old man, and a 40-year-old man who drove the car.

Rios had met Rogelio at the bus stop in Nuevo Laredo, in December 1997. At about 2:30 p.m. on April 4, he received a call on his cellular telephone from Rogelio, who offered to pay him $500 to deliver marihuana to another person. Rogelio told Rios to meet him at a gas station, where Rios would pick up someone who would know whom to contact at Grandy's Restaurant.

Rios drove a gold car to a gas station near Grandy's. Rogelio arrived, driving a white car with yellow license plates, which Rios previously had seen Rogelio driving in Nuevo Laredo. Moreno exited Rogelio's car and entered Rios's car.

2

Rios drove Moreno to Grandy's. Rios testified that when they arrived in the Grandy's parking lot, Moreno said, "That's the pickup." Moreno entered the restaurant and came out a short time later with Serna. Rios testified that he had not seen the truck or Serna before.

Rios told the pair to follow him. Serna drove the load vehicle, and Moreno rode as a passenger. Rios drove on Highway 35, then exited and pulled into the parking lot of the Elms Apartments. He waited there for a call from Rogelio, who instructed him to go to an auto shop at 200 North Marcella Street. According to Rios's testimony, Moreno walked up to Rios's car but said nothing. Rios told Moreno to follow him.

Vega testified that Rios first told him that Moreno had gotten into his car at the apartments and that Moreno called Rogelio. Rios changed his story and told Vega that Rogelio had called Rios and that Moreno had merely asked why they had stopped.

Serna and Moreno then followed Rios to 200 North Marcella Street. The car and truck pulled into the garage of an auto tint shop. Rios testified that when the truck got near his car inside the garage, Moreno was no longer in the truck. The last time he saw Moreno, Moreno had been close to the front door. Rios testified that Serna placed the marihuana into the trunk of Rios's car.

After about five to ten minutes, as the agents prepared to enter the garage and arrest the participants, the gold car exited. An agent pulled in behind the car and blocked it, and other agents secured the garage. Agents recovered nine bundles of marihuana from Rios's trunk, the same marihuana that had been in the load truck and seized by Customs the previous day. Moreno was arrested while seated in the

driver's seat of the load truck.

The agents testified that there were twenty people inside the garage but that only the three defendants were arrested. Agents spoke to everyone inside the garage, and apparently no one had information about the transfer of the marihuana or about Moreno's actions inside the garage.

Vega testified that he believed Moreno's role in the conspiracy was that of a middleman between Rogelio and Serna and as a "lookout" at the garage. Vega stated that it is unusual for participants in a drug conspiracy to associate with persons not participating in the conspiracy when they are doing acts in furtherance of the conspiracy. Another agent testified that Moreno's actions were characteristic of an individual involved as a lookout.

Rios testified that he did not know Moreno's role in the conspiracy, but only that Moreno would know the person at the restaurant. Rios testified that only he, Serna, and Rogelio knew that marihuana was being transferred from the truck to his car at the auto shop.

Moreno testified that he worked as a mechanic's assistant making about $40 to $50 a week. He had known Serna, who lived around the corner from him, for about five years. He saw Serna on April 2, 1998, driving the brown truck that was the load truck. Serna offered to pay Moreno $100 to drive a truck to Nuevo Laredo that Serna was going to buy in Dallas.

Serna planned to leave for Dallas on April 3 and said that someone was going to come get Moreno. On April 3, Rogelio, whom Moreno had not met before, arrived at Moreno's house, said that Serna had sent him, and asked

whether Moreno was going to Dallas to help drive the pickup.

Moreno rode with Rogelio and Rogelio's wife and son to the bridge at the border. Rogelio told Moreno to cross into the United States and wait for him at the H.E.B. grocery store in downtown Laredo. Rogelio, his wife, and son picked Moreno up from the store at about noon, and they traveled to Dallas in the same car that later delivered Moreno to the gas station near Grandy's.

They arrived in Dallas at about 8 p.m. and spent the night at the Ely Street home of people Moreno did not know. Moreno testified that he did not ask when he was going to meet up with Serna and that he did not have a phone number or any way to contact Serna.

The next morning, after Rogelio received a phone call, Moreno, Rogelio, and his son left the house and drove to the gas station. Rogelio told Moreno to get into a gold car with Rios and that Rios would take him to meet Serna at a restaurant. Moreno testified that this was the first time he met Rios.

Rios drove Moreno to Grandy's but did not tell Moreno anything. Moreno recognized the brown truck in the parking lot as the one he had seen Serna driving in Nuevo Laredo. Moreno found Serna inside Grandy's and told Serna, "They're looking for you outside." They exited the restaurant, and Moreno got into the passenger side of the truck with Serna. Moreno stated that he did not know where Serna was going.

Moreno testified that he did not know why Rios stopped at the apartments. Moreno asserted that he got out of the truck at the apartments to look for a place to get a drink of water. When he walked up to Rios's car, Rios told him to get back into the truck because they were going to keep going.

When they arrived at the auto tint shop, Serna told Moreno to wait for him near the door, and Serna proceeded inside the garage with the truck. Moreno testified that he was in the driver's seat of the truck when he was arrested, because Serna said he was tired and asked whether Moreno would drive the truck out of the garage. Moreno testified that he did not know who transferred the marihuana from the pickup to Rios's car, did not use marihuana, had never participated in the distribution of marihuana or other drugs, and did not know that Serna was taking marihuana to Dallas.

II.

Moreno argues that the evidence was insufficient to support his convictions and that the court erroneously denied his motion for judgment of acquittal. He argues that the government did not prove that he was a willing and knowing conspirator doing his part to further the conspiracy. He contends that the evidence showed only that he associated with individuals who were engaged in the transportation of marihuana and that he was merely present during the transportation of the drugs from Grandy's to Marcella Street.

Only "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." FED. R. CRIM. P. 52(b). Because Moreno failed to renew his motion for judgment of acquittal after the close of all the evidence, we are limited to a review for plain error. *See United States v. McCarty*, 36 F.3d 1349, 1358 (5th Cir. 1994).

It is not enough, therefore, for us merely to find that the district court would have erred had it denied a motion for judgment of

acquittal at the close of evidence. *See United States v. Olano*, 507 U.S. 725, 732 (1993). Rather, the error is reversible "only if it is 'plain' and 'affect[s] substantial rights.'" *Id.* "'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" *Id.* at 734 (citations omitted).

> Rule 52(b) was intended to afford a means for the prompt redress of miscarriages of justice. By its terms, recourse may be had to the Rule only on appeal from a trial infected with error so "plain" the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it. The Rule thus reflects a careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed.

*United States v. Frady*, 456 U.S. 152, 163 (1982).

Thus, for Moreno to prevail, he must do more than show that the evidence was insufficient; he must also show that insufficiency was "so 'plain' the trial judge and prosecutor were derelict in countenancing it." *Id.* Moreno cannot meet that high standard with respect to either count.

## A.

A defendant is guilty of conspiracy if (1) there is agreement between two or more persons to commit a crime and the defendant (2) knew of the agreement, and (3) voluntarily participated in the agreement. *See United States v. Bermea*, 30 F.3d 1539, 1551 (5th Cir. 1994); *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992). These elements need not

be proved by direct evidence. Moreover, "[o]nly slight evidence is needed to connect an individual to an illegal conspiracy once the United States has produced evidence of that conspiracy." *United States v. Vaquero*, 997 F.2d 78, 82 (5th Cir. 1993).

Thus, while mere presence and association with conspirators, alone, will not support an inference of participation in the conspiracy, *see Maltos*, 985 F.2d at 746, evidence of concerted action can indicate both agreement and voluntary participation in the conspiracy. *See United States v. Quiroz-Hernandez*, 48 F.3d 858, 866 (5th Cir. 1995). A jury may infer participation and membership in a conspiracy when the facts make it unlikely that conspirators would permit an innocent person to be present or act. *See United States v. Martinez-Moncivais*, 14 F.3d 1030, 1034-35 (5th Cir. 1994).

While Moreno's plea of innocence and ignorant acquiescence is not wholly lacking in plausibility, it is not sufficiently supported in the record to call for plain error reversal. He was not only present and associating with the co-conspirators, but played an active role in effecting the goals of the established conspiracy. While it is not impossible that Moreno did so blindly, without knowledge that he was participating in criminal activity, it was not plain error to allow the jury to conclude otherwise.

## B.

"Conviction for possession with intent to distribute requires proof of (1) knowing (2) possession (3) with intent to distribute." *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1236 (5th Cir. 1990). Possession of contraband may be either "actual or constructive and may be joint among several defendants. This court has defined

'constructive possession' as 'the knowing exercise of, or the knowing power or right to exercise dominion and control over the proscribed substance.'" *United States v. Cardenas*, 9 F.3d 1139, 1158 (5th Cir. 1993) (citations omitted).

When the contraband is hidden in a compartment within a vehicle, "[p]ossession of or control over a vehicle does not, standing alone, suffice to prove guilty knowledge." *Anchondo-Sandoval*, 910 F.2d at 1236. But, "knowing possession can be inferred from the defendant's control over the vehicle in which the illicit substance is contained if there exists other circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge." *Id.*

For the same reasons that Moreno's conspiracy conviction survives plain error review, there is sufficient circumstantial evidence to support an inference of knowing possession of marihuana. The suspicious surrounding circumstances supporting Moreno's knowing participation in the conspiracy can serve double duty and establish his constructive possession of the seized contraband.

Possession of an amount of marihuana larger than is necessary for personal consumption supports a finding that the defendant intended to distribute the drug. *See United States v. Williams-Hendricks*, 805 F.2d 496, 501-02 (5th Cir. 1986). The fifty-one pounds seized here falls squarely within that inference. It therefore was not plain error to allow the jury to convict Moreno for possession with intent to distribute marihuana.

AFFIRMED.